**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

MARTELL ELECTRIC, LLC,

              Plaintiff/Counter-Defendant,          Case No. 3:22-cv-00430

v.                                    Hon. Cristal C. Brisco

STEPHEN TISHHOUSE,              Hon. Michael G. Gotsch, Sr.
CARRIE TISHHOUSE, and
TISHHOUSE ELECTRIC, INC.,

              Defendants/Counter-Plaintiffs.

_____/

SOPKO, NUSSBAUM, INABNIT &
KACZMAREK
Brent E. Inabnit (#17387-71)
Kevin E. Warren (#26638-64)
Jessica R. Merino (#31759-17)
5th Floor – Plaza Building
210 South Michigan Street
South Bend, IN 46601
(574) 234-3000
brenti@sni-law.com
kevinw@sni-law.com
jessicam@sni-law.com

*Attorneys for Plaintiff/Counter-Defendants*

REVISION LEGAL, PLLC
Eric W. Misterovich (P73422)
8051 Moorsbridge Rd.
Portage, MI 49024
(269) 281-3908
eric@revisionlegal.com

*Attorneys for Defendants/Counter-Plaintiff*

_____/

**BRIEF IN SUPPORT OF DEFENDANTS/COUNTER-PLAINTIFFS' MOTION FOR
JUDGEMENT ON THE PLEADINGS AND PARTIAL SUMMARY JUDGMENT**

      Defendants Stephen Tishhouse, Carrie Tishhouse, and Tishhouse Electric, Inc., by and

through their attorneys, Revision Legal, PLLC, state as follows in support of their Motion for

Judgment on the Pleadings and Partial Summary Judgment.

## INTRODUCTION

The parties negotiated a deal for Martell to buy the Tishhouse assets. Post-closing, the relationship soured and litigation ensued. The Tishhouse claims are straightforward: Martell breached the Acquisition Agreement by: (i) terminating Stephen and Carrie Tishhouse employment prior the expiration of the promised two-year term and (ii) Martell owes money under the Acquisition Agreement's Work-In-Process provisions, which generally provided a profit sharing calculation on jobs Tishhouse brough to Martell. Summary judgment is proper on those claims as no genuine issue of material fact exists.

Martell's claims, however, are convoluted. Martell claims largely sound as internal complaints about a former employee rather than a federal court lawsuit. Specifically, Martell alleges several actions breached the Acquisition Agreement, including encouraging customers to cancel orders, misapplication of "shop time" rather than "job time," the Tishhouses filing an administrative annual report with the State of Michigan, and maintaining the Tishhouse website post-closing. But none of these items are subject to the Acquisition Agreement. As a result, judgment on the pleadings is proper. Further, Martell's two tortious interference claims fail to plead the "illegality" element. Again, judgment on the pleadings is proper.

In addition, deposition testimony from Martell and its employees unquestionably show that, even if the Acquisition Agreement is applicable to Martell's claims and it has stated a claim for tortious interference, it has zero evidence to support its claims and zero evidence of resulting damages. As a result, summary disposition is proper and Martell's First Amended Complaint should be dismissed in whole.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(c) motions for judgment on the pleadings "employ[ ] the same standard that applies when reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Collins v. Purdue University*, 703 F.Supp.2d 862, 869–70 (N.D.Ind. 2010). A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001); *Autry v. Northwest Premium Services, Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). In ruling on a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), the Court must draw all reasonable inferences that favor the plaintiff, construe allegations of the Complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Killingsworth v. HSBC Bank Nev., N.A.*, 517 F.3d 614, 618 (7th Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6), the "factual allegations must be enough to raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555; 127 S.Ct. 1955 (2007).

This Court recently summarized the standard of review on a motion for summary judgment as follows:

> Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted). A factual issue is material only if resolving the factual issue might

2

change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes for the non-moving party. *See Anderson*, 477 U.S. at 255.

*Celina Insurance Group v. Zinsmeister*, 2024 WL 1344749, at *3 (N.D. Ind. 2024).

## STATEMENT OF FACTS

Defendants/Counter-Plaintiffs (the "Tishhouses") adopt their Statement of Material Facts, and all exhibits filed in connection therewith, as if stated in full herein.

## ARGUMENT

### I.    SUMMARY JUDGMENT IN FAVOR OF THE TISHHOUSES IS PROPER.

#### A.    Martell Breached the Acquisition Agreement by Terminating the Tishhouses' Employment Prior to Expiration of their Two-Year Employment Term

At Count I, the Tishhouses alleged that Martell breached the Acquisition Agreement by terminating their employment before expiration of a two-year period. ECF No. 19 at ¶¶ 29-33.

At Section 5.5, the Acquisition Agreement states: "The parties contemplate entering into at-will Employment Agreements with Stephen Tishhouse and Carrie Tishhouse consistent with the terms of the Term Sheet between the parties, attached hereto as Exhibit 3, and as otherwise mutually agreeable to the Parties." (ECF 10-1, p.6). The Term Sheet contains specific, granular details regarding conditions and benefits of employment and specifically provided minimum employment terms, stating that Stephen Tishhouse "would be offered a position at Martell out of

the Portage MI office as Senior Service Manager **for at minimum two years**" and "Carrie Tishhouse would be offered a position as Administrative Coordinator in the Portage Office…this position **will also have at minimum a two year agreement**." ECF 10-1, p.18 (emphasis added).

Stephen and Carrie began working for Martell as of the date of the Acquisition Agreement, June 21, 2021. SMF at ¶ 9. Martell terminated their employment on April 15, 2022. SMF at ¶ 10.

### 1. *Contract Interpretation Principals*

Under Indiana law, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Norfolk Southern Railway Company v. Global Tower, LLC*, 620 F.Supp.3d 784, 797 (N.D.Ind., 2022). "The court's primary objective is "to give effect to the intentions of the parties as expressed in the four corners of the instrument." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 381 (7th Cir. 2001) (citations omitted). "Courts may not construe clear and unambiguous provisions, nor may it add provisions not agreed upon by the parties." *Oxford Fin. Grp., Ltd. v. Evans*, 795 N.E.2d 1135, 1142 (Ind. Ct. App. 2003). If the language of the contract is unambiguous and the intent of the parties is discernible from the written contract, the court must give effect to the terms of the contract. *DLZ Indiana, LLC v. Greene Cnty.*, 902 N.E.2d 323, 327–28 (Ind.App., 2009). Courts "must accept an interpretation of the contract which harmonizes its provisions, rather than one that places the provisions in conflict." *Noble Roman's, Inc. v. Hattenhauer Distributing Company*, 307 F.Supp.3d 907, 918 (S.D.Ind. 2018). "Generally, the courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions." *Davis v. Frontiersmen, Inc.*, 2023 WL 5381778, at *2 (N.D.Ind. 2023)*. "And, in reading the terms of a contract together, we keep in mind that the more specific terms control over any inconsistent general statements." *Noble Roman's, Inc.*, 307 F.Supp.3d at 918.

"Whether a contract is ambiguous is a question of law for the court." *Bradley v. Western & Southern Financial Group*, 2005 WL 2709282, at *3 (N.D. Ind. 2005) (citations omitted). "[A] contract is not ambiguous simply because a controversy exists where each party favors a different interpretation." *Id*. (citations omitted). Rather, "[a] contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." *Id*. (citations omitted).

> **2.      *The Acquisition Agreement Unambiguously Provided a Minimum Two-Year Employment Term.***

Section 5.5 of the Acquisition Agreement states: "The parties contemplate entering into at-will Employment Agreements with Stephen Tishhouse and Carrie Tishhouse consistent with the terms of the Term Sheet between the parties, attached hereto as Exhibit 3, and as otherwise mutually agreeable to the Parties." (ECF No. 10-1, p.6).

In contrast, the Term Sheet contains several specific details regarding the terms of employment and states that: "Stephen Tishhouse would be offered a position at Martell out of the Portage MI office as Senior Service Manager for at minimum a two year period." It then goes on to state six other elements being the: (a) compensation level; (b) flexibility as to whether the position is union or non-union; (c) the scope of estimating and service work for small, Portage-based projects; (d) the smaller scope of estimating larger projects based on availability; (e) option the minimum employment term if mutually agreement; and (f) an available bonus in lieu of a paid vacation. ECF No. 10-1, p.18.

The Term Sheet also contains specific details of employment for Carrie, stating that: "Carrie Tishhouse would be offered a position as an Administrative Coordinator in the Portage Office to support the office, project management, estimating, purchasing, etc." It then goes on to state five other elements being the: (a) compensation level; (b) stating this position "will also have at minimum a two-year agreement"; (c) extending the minimum employment term; (d) available

paid vacation time; and (e) participation in the company ESOP program and all other non-bargaining unit employee benefits.

Section 5.5 uses the term "at will" and Exhibit 3 sets a minimum employment term. But this does *not* render the Acquisition Agreement ambiguous. The Court must read the provisions in harmony and avoid an interpretation that finds conflict. *Noble Roman's, Inc.*, 307 F.Supp.3d at 918. And it is possible to give effect to the entirety of Section 5.5, including the "at will" language, while also giving effect to the entirety of the Term Sheet, including the minimum two-year term.

On the one hand, Section 5.5 states that, at some point in the future, the parties will give thought to[1] an at-will employment agreement that is consistent with the Term Sheet. For such an agreement to be consistent with the Term Sheet, it must include Term Sheet's employment details as to Stephen Tishhouse (title, compensation, flexibility on union/non-union, scope of estimating work, option to extend employment term, and vacation bonus) and the employment details as to Carrie Tishhouse (role, location, compensation, option to extend employment term, paid vacation, and other non-union benefits). Provided the "minimum employment term" has expired, then that term would not carry over to a new "at will" agreement. In other words, the "at will" nature of a future employment agreement would only arise after expiration of the two-year minimum employment period. This interpretation avoids finding a conflict and harmonizes the agreement, giving effect to all terms.

Exhibit 3's language unquestionably provides for a minimum duration of employment for two years. Section 5.5 of the Acquisition Agreement mandates that whatever employment

---

[1] "Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended." *King v. Ebrens*, 804 N.E.2d 821, 827 (Ind.App. 2004). The usual and common meaning of "contemplate" is "to look at or view with continued attention; observe thoughtfully." Random House Webster's College Dictionary, 2001.

agreements are entered into must be "consistent with the terms" of Exhibit 3's Term Sheet. ECF 10-1, p.6. This is clear and unambiguous language mandating a specific term of employment. This also fits within Indiana's recognized exception to at-will employment, namely, the "adequate independent consideration" supporting the Acquisition Agreement. *Orr v. Westminster Village North, Inc*., 689 N.E.2d 712, 718 (Ind. 1997). Under this standard, "if an employee establishes that 'adequate independent consideration' supports the employment contract, the Court generally will conclude that the parties intended to establish a relationship in which the employer may terminate the employee only for good cause." *Id*. (citation omitted). Adequate independent consideration is found when the "employer is aware that 'the employee had a former job with assured permanency (or assured non-arbitrary firing policies)' and 'the employee was only accepting the new job upon receiving assurances the new employer could guarantee similar permanency….'" *Id*. (citations omitted). Those facts are present here. Martell understood Stephen and Carrie owned their own business and expressly included job security provisions throughout the negotiations.  SMF at ¶ 2(j). Stephen and Carrie accepted Martell's offer stating that Stephen and Carrie "agree to continue to work as employees of Martell Electric for a term of two years." SMF at ¶ 2(c).

Martell will argue that Section 5.5's use of the term "at will" cannot be read out of the agreement or should not be read to only arise after expiration of the two-year term. This is incorrect. The Acquisition Agreement flatly does not contain language that binds Stephen or Carrie to anything other than employment terms "consistent with the terms" of the Term Sheet. The single use of "at will" is couched within a sentence that does not force or bind the Tishhouses to accept at will employment; but rather, requires them to "contemplate" entering into such agreements, and even then, only if such agreements are consistent with the Term Sheet.

The Term Sheet makes its intent clear. It not only states that Stephen "would be offered a position at Martell out of the Portage MI office as Senior Service Manager **for at minimum two years.**" ECF No. 10-1 at p. 18. It then doubles down on that intent stating that Carrie Tishhouse's position "***will also* have at minimum a two year agreement**." ECF No. 10-1 at p. 18 (emphasis added). Using the phrase "will also" is an intentional call back to the two-year term offered to Stephen. This more specific, plain language controls over the general "at will" language, which at most, called for Stephen and Carrie to consider an "at will" employment contract, but only if it was consistent with the Term Sheet. ECF No. 10-1 at § 5.5. Stephen and Carrie would never have accepted Martell's offer without a minimum term of employment given the artificially low cash portion of the purchase price. SMF at ¶___. As a result, this Court should find that Martell breached the Acquisition Agreement by terminating the Tishhouses employment prior to the expiration of the two-year term and set a trial on damages.

> **3.**   ***To the Extent an Ambiguity Exists, this Court should Determine the Ambiguity to be Patent and Find the More Specific Minimum Employment Term Controls over the General Reference to At Will***

A patent ambiguity is "apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning," but a latent ambiguity "arises only upon attempting to implement the contract." *Id.* at 1070–71 (citations omitted). *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 2009 WL 1107796, at *6 (N.D. Ind. 2009). When an ambiguity is patent, meaning it arises within the document, the court may not consider extrinsic evidence in resolving the ambiguity. *Ohio Cas. Group of Ins. Co. v. Gray*, 746 F.2d 381, 383 (7th Cir. 1984) (citing *Graham v. Anderson*, 454 N.E.2d 870, 872 (Ind. Ct. App. 1983)). On the other hand, a latent ambiguity raises a question of fact. *Bernstein v. Bankert*, 698 F.Supp.2d 1042, 1055 (S.D. Ind. 2010).

If the contract contains ambiguous language, "then the court may apply the rules of construction in interpreting the language." *Norfolk Southern Railway Company v. Global Tower, LLC*, 620 F.Supp.3d 784, 797 (N.D. Ind. 2022) (citation omitted). "Indiana law requires contracts to 'be construed so as to not render any words, phrases, or terms ineffective or meaningless.'" Id. (citation omitted). In "reading the terms of a contract together, we keep in mind that the more specific terms control over any inconsistent general statements. *Noble Roman's, Inc.*, 307 F.Supp.3d at 918.

The Term Sheet uses the specific phrase "at minimum of two years" twice, once in relation to each employee. A reading of the Agreement that does not give effect to this specific employment term would render the "at minimum of two years" a nullity. While this argument can cut both ways, and Martell will surely argue the Tishhouse interpretation reads the term "at will" out of the agreement, the Tishhouse interpretation is more consistent with the context and plain language of the entire Acquisition Agreement. *Noble Roman's, Inc.*, 307 F.Supp.3d at 918 (Courts "must accept an interpretation of the contract which harmonizes its provisions...."). The Term Sheet makes clear the offer to the Tishhouses of "at minimum of two years" of employment is part of the "transaction terms" of the "purchase of all the assets...." ECF No. 10-1, p.16 (see introductory paragraph).[2] The Term Sheet contains granular, specific details about the conditions of employment, from the specific job title, location, scope of estimating required for small and large projects to the issuance of bonuses, vacation time, and employee benefits. ECF No. 10-1, p.18. Martell, who drafted the Term Sheet (SMF at ¶ 2(g)) expressly stated that it believed it was an accurate reflection of the parties' negotiations leading to the sale. ECF No. 10-1, p. 19 ("I believe the above reflects [your] letter, our previous term sheet and our discussions."). On the other hand, Section 5.5 is oddly

---

[2] Find case law on recitals.

placed within *Martell's* representations and warranties, fails to include any *binding* "at will" language but instead speaks to a future agreement, and *wholly defers* to the Term Sheet for any details as to the terms of employment. Further, this future "at will" employment agreement was never executed and Martell believed it was the Tishhouses responsibility. SMF at ¶ 5.

If this Court determines a patent ambiguity exists, the Court should find that the more specific employment terms of the Term Sheet control over the general language used in Section 5.5. Adopting any argument by Martell to the contrary would render Section 5.5's adoption of the Term Sheet, and the Term Sheet's specific "at minimum two years" language meaningless. The intent of the Parties is clearly documented in the Term Sheet which sets detailed and specific conditions and benefits of employment, including an "at minimum two years" employment term. Martell's termination roughly one year into employment breached minimum two-year employment term, causing damages. Summary judgment on liability is proper and this Court should set a trial date on damages.

### B. Martell Admitted it Owes the Tishhouses Money under the Acquisition Agreement's Work-In-Process Provisions

At Count II of the Tishhouses' Counterclaim, they alleged Martell was liable for "refusing to remit any payment whatsoever to Tishhouse Electric" under the Acquisition Agreement's Work-In-Process Provisions. ECF No. 19.

As part of the Acquisition Agreement, specifically Section 2.1, the parties agreed to share the expenses and profit of certain work-in-process jobs. In discovery, Martell created an accounting of monies owed pursuant to the Work-In-Process provisions of the Acquisition Agreement indicating that Martell owed the Tishhouses a total of $15,177.54. SMF at ¶ 13. The first page indicates a total of $32,039.75 is the "current margin owed to Tishhouse" and there is a total of $76,913.50 in "projects expected margin to Tishhouse" for a total of $108,953.25 owed to

Tishhouse. SMF at ¶ 13(a). The first page also indicates the total "current AR owed to Martell is $16,862.21." The first page concludes that a total of $92,091.04 is owed to Tishhouse. SMF at ¶ 13(c).

However, Martell disputes whether profit associated with a job commonly referred to as Pinehurst should be included. The total profit for the Pinehurst job attributable to the Tishhouses would be $76,913.50. SMF at ¶ 14. The Tishhouses believe the Pinehurst project is properly included in the WIP Accounting. SMF at ¶ 15.

Notwithstanding that disagreement, *even under Martell's interpretation*, Martell still owes the Tishhouses a total of $15,177.54 under the Acquisition Agreement's Work-In-Process provisions. SMF at ¶ 16. This Court should enter an order consistent with Martell's admission and find Martell breached the Acquisition Agreement by not remitting the $15,177.54.

## II.    MARTELL'S FIRST AMENDED COMPLAINT SHOULD BE DISMISSED IN TOTAL

### A.    Martell's First Amended Complaint Fails to State a Claim For Tortious Interference and Should be Judgment on the Pleadings is Proper.

To state a claim for tortious interference with a business relationship claim, Martell must allege "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Miller v. Central Indiana Community Foundation, Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014). Similarly, to state a claim for tortious interference with contractual relations claim, Martell must allege "(1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from the defendant's

11

wrongful inducement of the breach." *Coleman v. Vukovich*, 825 N.E.2d 397, 403 (Ind. Ct. App. 2005). Further, "Illegal conduct by the alleged wrongdoer is an essential element of tortious interference" claims. *Miller*, 11 N.E.3d at 961. Both Indiana's Southern and Northern Federal District Courts (and this Court in ruling on the Tishhouse's Motion to Dismiss) have found that a breach of contract alone is *not* sufficient "illegal conduct" to support a tortious interference claim. *Smith v. Biomet, Inc.,* 384 F. Supp. 2d 1241, 1252 (N.D. Ind. 2005) citing *HAS, Inc. v. Bridgton, Inc.,* No IP 98–0167–C H/G, 1999 WL 1893209, at * 16 (S.D.Ind. Sept.20, 1999); See also this Court's November 3, 2022 Opinion, ECF No. 23 at p.5-6. The *Smith* court stated that tort law cannot displace contract remedies. *Id*. "To hold otherwise would be to "transmute the breach into the tort of tortious interference with business relations." *Id*. citing *Jeppesen v. Rust,* 8 F.3d 1235, 1239 (7th Cir.1993). "As the *Jeppesen* court has stated, allowing a breach of contract to be characterized as a tortious interference with business relations would make the tort a sort of 'wild card' that would lead to the award of punitive damages for simple breaches of contract." *Id*.

In dismissing Martell's Tortious Interference claims, this Court stated:

> Martell Electric's complaint doesn't allege enough factual content for either tortious interference claim. The complaint alleges that Martell Electric has business relationships and contracts with third parties and that the defendants unjustifiably interfered with those business relationships resulting in damages. Those allegations aren't specific facts – they're recitations of the elements of a tortious interference claim. **Neither does the complaint allege any facts suggesting illegal activity by the defendants**. The only allegations approaching illegal conduct are defamation and breach-of-contract, and those actions don't support a tortious interference claim. *Smith v. Biomet, Inc*., 384 F. Supp. 2d at 1252. On the other hand, Martell Electric plausibly alleges that the defendants continued to do business with and contact some third parties after they reached their agreement. But without more (say, facts about the relationships and contracts that were allegedly interfered with, how they were interfered with, what illegal conduct occurred, and the like), these allegations allow an inference for breach-of-contract claims, not an

inference that the defendants could be liable for tortious
interference. See id.

ECF No. 23 at p. 7 (emphasis added). In response, Martell's First Amended Complaint made some

changes. First, it removed any reference to "defamatory statements" being made. *Cf* ECF No. 1-2

and 30. Second, it more specifically plead that Stephen Tishhouse encouraged two customers to

cancel their orders with Martell and encouraged two employees to leave Martell's employment.

ECF No. 30 at ¶¶ 11(c), (d) and 13.

In other words, Martell's First Amended Complaint followed this Court's instruction to

allege "facts about the relationships and contracts that were allegedly interfered with [and] how

they were interfered with." But, the First Amended Complaint failed to allege any new facts as to

"what illegal conduct occurred."

"Indiana courts have not defined 'illegality' nor have they articulated a test for a showing

of 'illegal conduct.'" *Smith v. Biomet, Inc.*, 384 F.Supp.2d 1241, 1251–52 (N.D. Ind. 2005)

(citations omitted). But in this case, any difficulty presented by the somewhat blurry test is

outweighed by the undeniable fact that Martell failed to allege *any illegal conduct whatsoever*.

There are simply no new facts contained within the Amended Complaint that address the illegality

element. At most, the encouragement of customers and employees to move away from Martell

rings as a violation of a non-solicitation agreement. But, the Acquisition Agreement does not

contain any non-solicitation language. ECF 10-1. Even if it did, or this potentially implicated the

Acquisition Agreement's non-competition provision, just like Martell's original complaint, this

would create an inference of a breach of contract, which cannot form the basis of a tortious

interference claim. ECF No. 23 at p. 7; See also *Biomet*, 384 F.Supp.2d at 1253 ("Smith's argument

is without merit because this is simply another way of saying that the illegal or wrongful conduct

at issue in this case, was the breach of the contract. But as shown above, breach of contract is not "illegality" for purposes of a claim of tortious interference with business relations.).

Martell's First Amended Complaint failed to address a defect in its original pleading by not specifically adding *any new facts* to allege "illegal conduct" in support of its tortious interference claims. This is fatal to its tortious interference claims, which must be dismissed.

**B.    Martell and its Employees' Deposition Testimony Shows Martell Lacks Any Evidence Regarding Several of its Breach of Contract and Tortious Interference Claims.**

The deposition of Martell and its employees elicited several admissions that render large components of Martell's First Amended Complaint completely meritless. *Martell knew, or should have known, all of these facts prior to filing its First Amended Complaint.* The Tishhouses reserve the right to seek Rule 11 sanctions for Martell's failure to conduct an adequate pre-suit investigation and pursuit of entirely meritless claims according to their own testimony.

*1.    Martell's Claims Regarding John Stap Canceling his Order Must Be Dismissed*

Martell alleged that Stephen Tishhouse encouraged customer John Stap to cancel his order. ECF No. 30 at ¶ 11(c). Martell expressly pleads this as a breach of the Acquisition Agreement and seems to also plead this as either or both of its tortious interference claims. *Id*. But under any theory, this claim fails.

First, judgment on the pleadings is proper because the Acquisition Agreement does not contain any relevant provision that would be implicated by this allegation. There is no contractual provision governing this claim and it sounds in tort.

Further, Martell's own corporate deposition testimony made clear the only evidence it possessed regarding this claim was "someone" called the Portage office and spoke to either "Chris or Shane", both Martell employees and told either Chris or Shane that whoever called said "Steve

contacted them and told him to cancel the work with Martell." SMF at ¶ 22(b). But Shane testified

that he had no personal knowledge of these events. SMF at ¶ 22(c). And Chris recalled speaking

to someone, either Mr. Stap or a representative from Hawks Hollow (the builder on the project);

however, Chris admitted that the voice on the other side of the phone never stated Stephen

Tishhouse encouraged him to cancel the order. SMF at ¶ 22(d). Further, a representative from

Hawks Hollow, the builder on the Stap project, expressly denied the allegation regarding Stephen

Tishhouse. SMF at ¶ 22(e). Finally, Stephen Tishhouse denies encouraging Mr. Stap or the builder

to cancel this order. SMF at ¶ 22(f). If Martell would have interviewed its own employees or the

builder prior to filing its First Amended Complaint, Martell would have known it lacked any

evidence regarding this claim. It failed to do so. Any of Martell's claims regarding Mr. Stap must

be dismissed.

### 2.    *Martell's Claims Regarding Johnathan Nawrocki Canceling his Order Must Be Dismissed*

Martell alleged that Stephen Tishhouse encouraged customer Jonathan Nawrocki to cancel

his order. ECF No. 30 at ¶ 11(d). Martell pleads expressly pleads this as a breach of the Acquisition

Agreement and seems to also plead this as either or both of its tortious interference claims. *Id*. But

under any theory, this claim fails.

First, judgment on the pleadings is proper because the Acquisition Agreement does not

contain any relevant provision that would be implicated by this allegation. There is no contractual

provision governing this claim and it sounds in tort.

And further, in almost identical fashion to the claim regarding Mr. Stap and what will

become a pattern, Martell's own corporate deposition testimony made clear the only evidence it

possessed regarding this claim was that another employee, Chris Wilson, allegedly spoke to Mr.

Nawrocki and heard Mr. Nawrocki say that Stephen Tishhouse encouraged him to cancel his order.

15

SMF at ¶ 24(a). However, Chris Wilson testified in a complete opposite manner and admitted that he never heard Mr. Nawrocki state that Stephen Tishhouse encouraged this order to be cancelled. SMF at ¶ 24(c). Finally, Stephen Tishhouse denies encouraging Mr. Nawrocki to cancel this order. SMF at ¶ 24(e). If Martell would have interviewed its own employees prior to filing its First Amended Complaint, Martell would have known it lacked any evidence regarding this claim. It failed to do so. Any of Martell's claims regarding Mr. Nawrocki must be dismissed.

### 3. Martell's Claims Regarding Adam Bielby and Ben Hansen Must Be Dismissed

The First Amended Complaint alleged that Subsequent to the termination of Stephen and Carrie's termination, "on information and belief, Stephen Tishhouse contacted Martell employees Adam Beilby and Ben Hanson encouraging them to leave the employment of Martell to work for competitor Hi-Tech Electric, stating his belief and intention that if they left, Martell would be forced to close its Michigan operations…Subsequently, Adam Beilby left his employment with Martell." ECF No. 30 at ¶ 13.[3]

Again, in similar fashion to Martell's claims regarding Mr. Stap and Mr. Nawrocki, Martell's deposition testimony made clear its only evidence regarding Stephen Tishhouse encouraging Adam Biebly and Ben Hansen to leave Martell's employment is entirely based on employee Chris Wilson hearing the employees make that statement. SMF ¶¶ 26(a) and 27(a). True to form, Chris Wilson testified as to the exact opposite, stating that neither Mr. Bielby nor Mr. Hansen made such statements. SMF ¶¶ 26(b) and 27(b). Stephen Tishhouse denies encouraging either person to leave Martell's employment. SMF ¶¶ 26(c) and 27(c). Further, Mr. Biebly expressly denied this allegation against Stephen Tishhouse. SMF at ¶ 26(d). If Martell would have

---

[3] Unlike its allegations at ¶¶ 8-11, Martell does not plead this allegation as a breach of the Acquisition Agreement and it sounds in tort only. As a result, it is not subject to Defendants/Counter-Plaintiffs' Motion for Judgment on the Pleadings.

interviewed its own employees prior to filing its First Amended Complaint, Martell would have known it lacked any evidence regarding these claim. It failed to do so. Any of Martell's claims regarding Mr. Biebly and Mr. Hansen must be dismissed.

####    4.    *Martell Admitted its Claims Regarding Depositing Checks was Factually Incorrect and its Claim for Conversion Must Be Dismissed*

Martell alleged that Stephen and Carrie breached the Acquisition Agreement by the "acceptance of payments for Work Orders 43902 of $819.00 and $80.00 from Lee Township Fire Department for work performed by Martell, which were deposited into a Tishhouse bank account." ECF No. 30 at ¶ 11(b). This is the only allegation that supports Martell's conversion claim.

Again, the Acquisition Agreement does not contain any relevant provision that would be implicated by this allegation and Martell's breach of contract claim must be dismissed pursuant to the Defendants/Counter-Plaintiffs' Motion for Judgment on the Pleadings.

Further, in its deposition, Martell testified that Lee Township, was sent an invoice by Martell, but for some reason, Lee Township paid Tishhouse, and Tishhouse deposited the money into a Tishhouse account. SMF at ¶ 29(e). Martell then admitted that Tishhouse remitted the money to Martell. SMF at ¶ 29(f) (Q: "And then Tishhouse remitted the money to Martell, correct?" A: "Correct. I did not know until [Martell's attorney] showed me after the Tishhouse deposition.").

The elements necessary to establish a civil cause of action for conversion are found in the criminal conversion statute. *McKeighen v. Daviess County Fair Bd.*, 918 N.E.2d 717, 723 (Ind. Ct. App. 2009). The statute defines conversion as "knowingly or intentionally [exerting] unauthorized control over property of another person." Ind. Code Ann. § 35-43-4-3. Martell has admitted the Tishhouses have *not* exerted unauthorized control over Martell payments and its claim for conversion fails.

Again, Martell was aware of this factual history which was disclosed to Martell several times throughout this litigation. SMF at ¶ 29(a)-(d). And of course, all of the information as to whether these checks were received by Martell was within Martell's possession. Yet, Martell never sufficeintly investigated this matter and proceeded with a baseless claim. SMF at ¶ 29(g).

### C.      Martell's Claims Regarding Shop Time Must Be Dismissed

Martell alleged that Stephen and Carrie breached the Acquisition Agreement by the "misapplication of job time as shop time rather than billing time to the specific jobs, artificially inflating the Tishhouse's profit margins for certain generator installation jobs, among others, in which the Tishhouses received profits and payments from Martell as part of the Agreement." ECF No. 30 at ¶ 11(a).

First, judgment on the pleadings is proper because the Acquisition Agreement does not contain any relevant provision that would be implicated by this allegation. There is no provision in the Acquisition Agreement regarding the parameters of billing shop time versus job time. ECF No. 10-1. The claim regarding improper billing has nothing whatsoever to do with the provisions of the Acquisition Agreement and should be dismissed.

To the extent this claim pertains to either of the tortious interference claims, it also fails as a matter of law. There is no allegation that this pertains to any of the elements of a tortious interference with business relationship or contract claim, including: (i) a specific valid relationship or enforceable contract, (ii) the Tishhouses' knowledge of the same, (iii) the interreference with such relationship or contract, (iv) the absence of justification, or (v) damages. *Miller*, 11 N.E.3d at 961; *Coleman*, 825 N.E.2d at 403. The claim also fails to plead any facts as to illegality. *Biomet, Inc.*, 384 F.Supp.2d at 1251–52. This is a complaint about an employee's billing practices, not grounds for a federal court lawsuit.

Further, Martell has no evidence regarding this claim. During its corporate deposition, Martell testified that certain documents referenced what Martell believed to be too much shop time, however, outside of recalling too much shop time being applied to a job commonly referred to as Pinehurst, Martell was unable to provide any meaningful details, job numbers, job titles, or other information regarding this claim. SMF at ¶ 31(c)-(d). Martell admitted they could produce additional documents regarding this claim. SMF at ¶ 31(g) . Martell failed to produce any documents whatever regarding its allegation of improperly tracking shop time prior to the Martell deposition. SMF at ¶ 31(e). Martell then admitted it could never accurately determine any alleged damages. SMF at ¶ 31(f). Finally, subsequent to the Martell deposition, and contrary to its duty to supplement discovery requests pursuant to Fed. R. Civ. P. 26(e), Martell never produced any responsive documents regarding misapplication of shop time. SMF at ¶ 31(h). Its vague deposition testimony, that is unable to provide any actual facts as to its claims, should not be permitted to create a fact as to damages when Martell has wholly failed to produce any responsive documents whatsoever.

### D.    Martell's Claims Regarding the Filing of a Corporate Annual Statement Required By Law Must Be Dismissed

Martell alleged that Stephen and Carrie breached the Acquisition Agreement by the filing an annual report with the State of Michigan Department of Licensing and Regulatory Affairs indicating that Tishhouse has continued to operate since Martell's acquisition in June 2021." ECF No. 30 at ¶ 11(e). It is unclear whether Martell also believes this constitutes either of its tortious interference claims.

First, judgment on the pleadings is proper because the Acquisition Agreement does not contain any relevant provision that would be implicated by this allegation. There is no contractual provision prohibiting Tishhouse Electric, Inc. from filing its annual statement. ECF No. 10-1. The

claim regarding maintaining corporate formalities has nothing whatsoever to do with the provisions of the Acquisition Agreement.

Tishhouse Electric, Inc., an active participant in federal court litigation and currently owed money by Martell (SMF ¶ 16) has reason to maintain its corporate existence, as recognized by John Martell himself. (SMF ¶ 33(c)). Filing an annual report is a requirement to maintain good standing under Michigan law. MCL 450.1911(1) ("A domestic corporation and each foreign corporation subject to chapter 10 shall file a report with the administrator no later than May 15 of each year"). And further, as Martell admits, this administrative filing did not cause Martell any damages whatsoever. SMF ¶ 33(b). Instead, this seems to be an internal issues Martell encountered with the Tishhouses, but it has no place in a federal court lawsuit.

### E.    Martell's Claims Regarding the Alleged Continued Operation of Tishhouse Electric Must Be Dismissed.

At ¶¶ 8-10 of its First Amended Complaint, Martell alleged:

8.    Pursuant to the Agreement, the Tishhouses agreed to, among other things, cease operations of Tishhouse Electric.

9.    On or around November 8, 2021, the Tishhouses were specifically instructed by Martell and the Tishhouses agreed to cease all operations in the Tishhouse name.

10.    Despite their agreement to cease operation of Tishhouse Electric, the Tishhouses continued to operate the former Tishhouse Electric in several respects:

(a)    The Tishhouses continued using the Tishhouse website to generate business.

(b)    From December 2021 until as late as August 2022, the Tishhouses continued to purchase supplies in the name of Tishhouse Electric from vendors including Standard Electric Company, Kendall Electric Group, and Hodgson Light & Log that were not affiliated with Martell project.

(c)    Subsequent to the closing of the purchase and the

Tishhouses' employment with Martell and as late as March, 2022, the Tishhouses continued to apply for permits under the Tishhouse name.

### 1. Maintaining the Corporate Existence of Tishhouse Electric is Not a Breach of the Acquisition Agreement

As to ¶ 8, Martell elected not to specifically cite what provision of the Acquisition Agreement is at issue. As to ¶ 9, Martell alleges that on November 8, 2021 it instructed the Tishhouses to cease all operations in the Tishhouse name and that the Tishhouses agreed to the same. This claim subject to its Motion for Judgment on the Pleadings as no contractual provision applies. At most, the only applicable provision of the Acquisition Agreement is § 1.1-8, which states that the "Goodwill" associated with the Tishhouse name is an asset being purchased. ECF No. 10-1. However, there is no express provision requiring Tishhouse Electric, Inc. to file dissolution paperwork, or change its corporate name, subsequent to Closing. ECF No. 10-1. Martell could have easily included such provisions and it elected against it. Put simply, while Martell may have instructed its employees to "shut down" a business entity, that is not a contractual term of the Acquisition Agreement and cannot form the basis for a breach of contract action.

Further, Martell has displayed an understanding that it is not possible to simply shut down a business entity given lingering business issues that must be addressed. SMF ¶ 33(d). And further, as Martell admits, this administrative filing did not cause Martell any damages whatsoever. SMF ¶ 33(b). The continued existence of Tishhouse Electric, Inc., as explained above, is not ground for a breach of the Acquisition Agreement.

### 2. Maintaining the Tishhouse Website is Not a Contractual Issue and Caused Martell no Damages

This claim subject to its Motion for Judgment on the Pleadings as no contractual provision applies. Again, the only applicable provision of the Acquisition Agreement is § 1.1-8, which states

that the "Goodwill" associated with the Tishhouse name is an asset being purchased. ECF No. 10-1. They delay in shutting down the website was not intentional, but was due to technical issues and lost passwords. SMF ¶ 37. This is not a situation in which the Tishhouses were claiming ownership of the website. This is not a situation in which the Tishhouses wrongfully retained the domain name. In fact, Martell has never even asked for it. As recently as its March 2024 deposition, Martell had not even started the simple process to transfer the underlying domain name associated with the Tishhouse website to Martell. SMF at ¶ 38. This is more accurately described as a punch list item to fully transfer assets to the purchaser, not a breach of contract claim in federal court. No contractual provision applies and judgment on the pleadings is proper.

Further, there are no damages. Specifically, when asked whether the Tishhouses generated any work that competed with Martell from the Tishhouse website, Martell responded "I don't know how to answer that. You have to ask the Tishhouses. SMF at ¶ 40(a). The Tishhouses answer to that question is: no, they did not compete with Martell. SMF at ¶ 40(b). No leads were generated through the Tishhouse website post-closing. SMF at ¶ 16. Martell suffered no cognizable damages and any claims based on the operation of the Tishhouse website should be dismissed.

### 3.    *Martell Has No Evidence that any Invoices in the name of Tishhouse were for Non-Martell Projects*

After it terminated Stephen and Carrie's employment, Martell found copies of old invoices, permits, and quotes using the Tishhouse name after Closing. SMF at ¶ 41(e). Martell believes this forms a cause of action for breach of contract. It doesn't. There is no specific provision of the Acquistion Agreement that is implicated by Martell's allegations. As a result, judgment ton the pleadings is proper. Further, any breach of contract action must have damages. Martell testified it has none.

Martell's First Amended Complaint does not expressly allege the Tishhouses violated the Acquisition Agreement's noncompete provision at § 1.1-8. ECF No. 10-1. However, at 10(b), the First Amended Complaint alleges that, post-Closing, the Tishhouses were ordering supplies for projects unaffiliated with Martell. However, Martell has no evidence to support this claim. At most, Martell testified that it located invoices for jobs that were not listed on the Work-In-Process exhibit to the Acquisition Agreement. SMF at ¶ 41(d). But that alone is not evidence of damages. When asked about what damages actually in connection with using the Tishhouse name to obtain quotes for materials, Martell responded:

> Q: What damage did [obtaining a quote] cause to Martell?
> A: I don't – the Tishhouse account shouldn't have been being used.
> Q: What damage did that cause to Martell?
> A: I can't – I can't tell you. It sets a predecence that they keep using the Tishhouse account.
> Q: You can't tell me the damages, correct?
> A: Not yet I guess.

SMF at ¶ 41(f).

## CONCLUSION

For the reasons stated herein, Defendants/Counter-Plaintiffs respectfully request this Honorable Court **GRANT** their Motion for Judgment on the Pleadings and Partial Summary Judgment and enter an order finding:

1.    Martell breached the Acquisition Agreement by terminating Stephen and Carrie Tishhouse's employment prior to expiration of the "at minimum two year" term;

2.    Martell breached the Acquisition Agreement by failing to remit the $15,177.54 Martell admit its owes;

3.    Dismissing Martell's First Amended Complaint in whole; and

4.    Granting any other relief the Court deems appropriate.

Respectfully submitted,

23

Date: May 15, 2024                    REVISION LEGAL, PLLC

                                      /s/Eric Misterovich
                                      Eric Misterovich
                                      *Attorneys for Defendants*
                                      Revision Legal, PLLC
                                      8051 Moorsbridge Rd.
                                      Portage, MI 49024
                                      269-281-3908
                                      eric@revisionlegal.com

                                      *Attorneys for Defendants/Counter-Plaintiff*


## CERTIFICATE OF SERVICE

The undersigned certifies that on the date below, the foregoing Brief in Support was served

on counsel of record via the Court's ECF system.

                                      Respectfully submitted,

Date: May 15, 2024                    REVISION LEGAL, PLLC

                                      /s/Eric Misterovich
                                      Eric Misterovich
                                      *Attorneys for Defendants*
                                      Revision Legal, PLLC
                                      8051 Moorsbridge Rd.
                                      Portage, MI 49024
                                      269-281-3908
                                      eric@revisionlegal.com

                                      *Attorneys for Defendants/Counter-Plaintiff*