UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MARTELL ELECTRIC, LLC,

      Plaintiff,

      v.                               Case No. 3:22-CV-430-CCB

STEPHEN TISHHOUSE, et al.,

      Defendants.

## OPINION AND ORDER

On June 18, 2021, Martell Electric, LLC ("Martell") and Tishhouse Electric, Inc. ("Tishhouse Electric") entered into an Asset Acquisition Agreement ("Agreement"). (ECF 50-6). Martell agreed to purchase all of Tishhouse Electric's assets used in the operation of Tishhouse Electric, including purchase orders, sales contracts, and goodwill. For work under contract with Tishhouse Electric, Martell agreed to share certain profits from those contracts with Stephen Tishhouse and Carrie Tishhouse (the "Tishhouses" and, together with Tishhouse Electric, the "Defendants"[1]), and the Tishhouses agreed to pay Martell certain markups on its labor, equipment, and material. The Tishhouses also agreed to not compete with the services of Martell for three years within a certain geographical area. Martell then hired the Tishhouses to work for Martell.

---

[1] The Defendants have countersued, so the Defendants are also counter-plaintiffs here. For the sake of clarity, the Court will refer to the Tishhouses and Tishhouse Electric in this Opinion and Order collectively as the "Defendants."

After the parties entered into the Agreement, the relationship between Martell and the Tishhouses soured, and Martell terminated the Tishhouses' employment less than two years after hiring them. Martell initially filed its complaint in Indiana state court, and the case was removed to this Court on June 2, 2022. (ECF 1, 2). The Court, under a previous presider, granted the Defendants' motion to dismiss Martell's complaint in part. (ECF 23). Following the Court's order, Martell filed its first amended complaint. (ECF 30). In Martell's first amended complaint, it alleges that the Tishhouses breached the Agreement in several respects, encouraged Martell customers to cancel their order with Martell, and encouraged Martell employees to work for a competitor. Martell thus sued the Defendants for breach of contract (Count I), tortious interference with business relationships (Count II), tortious interference with contractual relationships (Count III), and conversion (Count IV).

On September 6, 2022, Defendants filed their counterclaim. (ECF 19). The Defendants allege that Martell breached the Agreement by terminating the Tishhouses' employment within two years, and by not giving the Tishhouses certain profits that the Tishhouses allege they are entitled to under the Agreement. The Defendants also allege that Martell has refused to relinquish possession of the Defendants' property. The Defendants thus countersued Martell for breach of an employment agreement (Count I), breach of contract for proceeds from work in process (Count II), and statutory conversion (Count III).

Pending before the Court is Martell's motion for partial summary judgment on Defendants' counterclaim (ECF 49), Defendants' motion for judgment on the pleadings

and motion for partial summary judgment on Martell's first amended complaint (ECF 46), and Martell's motion for leave to file a response to Defendants' motion to strike. (ECF 63). The Court will first address the Defendants' motion for judgment on the pleadings, then the parties' summary judgment motions and Martell's motion for leave to file a response to Defendants' motion to strike.

## I.    THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

### a.    LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The court decides such a motion "under the same standard as a motion to dismiss under Rule 12(b)." *N. Ind. Gun & Outdoor Shows, Inc. v. S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998); *see also Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). The court should grant a Rule 12(c) motion "only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Brunt v. Serv. Emps. Int'l Union,* 284 F.3d 715, 718–19 (7th Cir. 2002).

The facts recounted as part of the Court's analysis of the Defendants' motion for judgment on the pleadings come from Martell's first amended complaint (ECF 30), which are accepted as true for purposes of this motion with all reasonable inferences drawn in Martell's favor. *See Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

### b. ANALYSIS

The Defendants move for judgment on the pleadings as to Martell's breach of contract claim (Count I), tortious interference with business relationships claim (Count II), and tortious interference with contractual relationships claim (Count III). (ECF 46). The Defendants did not move for judgment on the pleadings as to Martell's conversion claim (Count IV).

### i. Breach of contract claim

Martell alleges that as part of the Agreement, the Tishhouses agreed to not compete with Martell and to cease operations of Tishhouse Electric. (ECF 30 at ¶¶ 7-8). After entering into the Agreement, Martell alleges that the Tishhouses competed with Martell and failed to cease operations in violation of the Agreement by operating the Tishhouse Electric website to generate business, purchasing supplies in Tishhouse Electric's name from several vendors, applying for permits and sending invoices in Tishhouse Electric's name, and maintaining Tishhouse Electric's corporate existence. (ECF 30 at ¶ 10). Martell further alleges that the Tishhouses breached the Agreement when the Tishhouses encouraged Martell customers John Stap and Jonathan Nawrocki to cancel their orders with Martell, accepted payments for work performed by Martell and deposited into their own bank account, and misapplied job time as shop time rather than billing time to inflate their profit margins. (*Id*. at ¶ 11).

To recover for a breach of contract under Indiana law,[2] "a plaintiff must prove that: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007).

The Defendants argue that the alleged conduct by the Tishhouses does not plausibly give rise to a breach of contract because such alleged conduct does not implicate any provision of the Agreement. However, taking the allegations as true, as this Court must on a motion for judgment on the pleadings, Martell has plausibly alleged that the Defendants breached the Agreement. Accordingly, the Court denies the Defendants' motion for judgment on the pleadings as to Martell's breach of contract claim.

### ii.  Tortious interference with business relationships claim

The Defendants next argue that Martell's tortious interference with business relationships claim (Count II) should be dismissed because the claims do not allege that the Tishhouses engaged in illegal conduct. (ECF 47 at 12-15). The Court agrees with the Defendants.

A claim for tortious interference with business relationships requires: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional interference with the relationship; (4) the absence of

---

[2] Section 8.7 of the Agreement provides that the disputes arising out of the Agreement shall be governed by Indiana law. (ECF 50-6 at 9). No party disputes that Indiana law applies. The Court therefore applies Indiana law in its analysis.

justification; and (5) damages." *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014) (citation omitted). The plaintiff must also show that the defendant engaged in illegal conduct. *Id.* However, the illegal conduct does not need to be criminal. *Smith v. Biomet, Inc.*, 384 F. Supp. 2d 1241, 1252 (N.D. Ind. 2005) (citing *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir. 1999)). But breach of contract is not the sort of illegal conduct that supports a tortious interference of business relationships claim. *Id.* "To hold otherwise would be to transmute the breach into the tort of tortious interference with business relations." *Id.* (citing *Jeppesen v. Rust*, 8 F.3d 1235, 1239 (7th Cir. 1993)) (internal quotations omitted).

In its first amended complaint, Martell alleges that Martell has "valid business relationships with various parties, including their employees" and that the Defendants "unjustifiably interfered with Martell's business relationships." (ECF 30 at ¶¶ 20-21). The only other alleged facts that support Martell's tortious interference with a business relationship claim is that the Tishhouses allegedly encouraged other customers to cancel their orders, and two Martell employees to leave and work for a competitor. (ECF 30 at ¶¶ 11, 13). But Martell does not allege that the Defendants engaged in illegal conduct.

Martell argues that the Tishhouses' alleged conduct gives rise to a breach of fiduciary duty, which satisfies the illegality requirement for its tortious interference with business relationships claim. While a breach of a fiduciary duty may satisfy the illegality requirement, *see Meridian Fin. Advisors, LTD. v. Pence*, 763 F. Supp. 2d 1046, 1064 (S.D. Ind. 2011), Martell does not allege any facts that give rise to a breach of fiduciary duty in its first amended complaint.

Accordingly, Martell fails to state a claim for tortious interference with a business relationship. The Defendants' motion for judgment on the pleadings is granted as to that claim, and the Defendants' motion for summary judgment as to that claim is denied as moot.

### iii.  Tortious interference with contractual relationships claim

As to Martell's tortious interference with contractual relationships claim, the Defendants also argue that judgment on the pleadings is proper because Martell does not allege that the Tishhouses engaged in illegal conduct. The elements of a tortious interference with a contractual relationship claim are: "(1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages." *Coleman v. Vukovich*, 825 N.E.2d 397, 403 (Ind. Ct. App. 2005).  However, unlike a claim of intentional interference with a business relationship, a claim of intentional interference with a contractual relationship does not require the plaintiff to plead or prove illegal conduct to sustain a cause of action. *Bradley v. Hall*, 720 N.E. 2d 747, 751 (Ind. Ct. App. 1999).

The Court recognizes that its determination that an intentional interference with a contractual relationship claim does not require a plaintiff to plead or prove illegal conduct is a contrary conclusion than this Court, under a previous presider, made in its Opinion and Order granting the Defendants' motion to dismiss Martell's intentional interference with a contractual relationship claim in Martell's initial complaint. In that Order, the Court granted the Defendants' motion to dismiss in part because Martell did

not plead that the Tishhouses engaged in illegal conduct. (ECF 23 at 5). While the doctrine of law of the case "establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit," the doctrine is "discretionary, not an inflexible dictate." *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 701 (7th Cir. 2024) (internal quotations and citations omitted). Departure from the doctrine is appropriate where the previous decision is clearly erroneous. *Id.*

The Court is unaware of any caselaw in which the court required illegal conduct as an element of a tortious interference with a contract claim under Indiana law. To the contrary, the Indiana Court of Appeals decision in *Bradley* rejects imposing the illegality requirement into an intentional interference with a contractual relationship claim, positing that illegality is required for tortious interference with a business relationship claim but not an interference with contractual relations claim because the Restatement of Torts "suggests that interference with prospective business relations requires more blameworthy means be used than does interference with contractual relations." 720 N.E.2d at 751 n. 3 (citing *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 542 n.6 (7th Cir. 1986)). The Defendants do not cite any case in which a court recognized an illegal conduct element in a tortious interference with a contractual relationship claim. Rather, the cited cases by the parties require the illegal conduct element only in a tortious interference with a business relationship claim. *See, e.g., Miller v. Cent. Indiana Cmty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014); *Smith v. Biomet*, 384 F. Supp. 2d 1251, 1249 (N.D. Ind. 2005); *Jeppesen v. Rust*, 8 F.3d 1235, 1239-40 (7th Cir. 1993); *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1062-63 (S.D. Ind. 2011); *see*

*also Wells v. Freeman Co.,* No. 3:21-CV-47-JRS-MPB, 2022 WL 17736638, at *14 (S.D. Ind. Dec. 16, 2022) ("A tortious interference claim based on a contractual relationship does not require a showing of illegality.").

Accordingly, the Court finds that the previous determination in the Opinion and Order on the Defendants' motion to dismiss Martell's initial complaint (ECF 30) that illegal conduct is a required element for a tortious interference with a contractual relationship claim was clearly erroneous. Because Martell is not required to plead or prove illegal conduct by the Tishhouses for a tortious interference of a contract claim under Indiana law, and the Defendants do not argue that judgment on the pleadings is proper for any other reason, the Court denies the Defendants' motion as to that claim.

## II. MARTELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT(ECF 49), THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF 46), AND MARTELL'S MOTION FOR LEAVE TO FILE RESPONSE TO DEFENDANTS' MOTION TO STRIKE (ECF 63)

Pending before the Court is Martell's motion for summary judgment (ECF 49), Defendants' motion for summary judgment (ECF 46) and Martell's motion for leave to file a response to the Defendants' motion to strike, (ECF 63). The parties cross-move for summary judgment on Count I of Defendants' counterclaim arising from Martell allegedly terminating the Tishhouses' employment within two years. Martell moves for summary judgment on Count II of Defendants' counterclaim arising from Martell not sharing profits in connection with the Pinehurst project, while the Defendants move for summary judgment on that same count for Martell not sharing profits in connection with other projects. The Defendants also move for summary judgment on Martell's

breach of contract claim (Count I), tortious interference with a contractual relationship claim (Count III), and conversion claim (Count IV). The Court will address each in turn, followed by Martell's motion for leave.

### a. STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The court must not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court does not have to conduct research or develop arguments for parties either. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

"To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present

sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

### b. Analysis

#### i. The Defendants' counterclaim for breach of an employment agreement (Count I)

The following relevant background facts are not in dispute. In Spring 2021, the parties began discussions regarding the sale of substantially all of Tishhouse Electric's assets to Martell. (ECF 50-2 at 3). Proposed terms were set forth on two separate term sheets, one dated May 24, 2021 (ECF 50-3) and another dated the following day on May 25, 2021 (the "Term Sheet"). (ECF 50-4). Under Section 16 of the Term Sheet, it states that Stephen Tishhouse "would be offered a position at Martell out of the Portage MI office as Senior Service Manager for at minimum a two year period." (*Id*. at 3). It also states that Carrie Tishhouse "would be offered a position as Administrative Coordinator in the Portage Office to support the office, project management, estimating, purchasing, etc." and that the position "will also have at minimum a two year agreement." (*Id*. at 3-4). On June 18, 2021, John Martell emailed the Tishhouses an

updated draft acquisition agreement. (ECF 55-1 at 2). That same day, John Martell

visited the Tishhouses in Portage, Michigan, and provided them a hard copy of the

draft acquisition agreement. (ECF 55-2 at 2). The Tishhouses reviewed the draft

acquisition agreement before signing it, but did not review it with an attorney. (ECF 55-

2 at 2). The Tishhouses, on behalf of Tishhouse Electric, and John Martell, on behalf of

Martell, executed the Agreement at that time. (ECF 50-6; ECF 55-2). The Agreement,

among other things, contains a provision related to an employment agreement between

the parties. (ECF 50-6 at 7). No separate employment agreements were entered into

between Martell and Stephen Tishhouse or Carrie Tishhouse following execution of the

Agreement. (ECF 50-2 at 9).  Martell terminated the Tishhouses on April 15, 2022, less

than two years after hiring them. (ECF 50-2 at 14).[3]  Defendants allege that Martell

breached the Agreement by terminating the Tishhouses within two years. Both parties

have moved for summary judgment as to this counterclaim.

To recover for a breach of contract under Indiana law,[4] "a plaintiff must prove

that: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff

suffered damage as a result of the defendant's breach." *Collins v. McKinney*, 871 N.E.2d

363, 370 (Ind. Ct. App. 2007) (citation omitted). The basic requirements for a contract are

---

[3] Defendants cite to page 52 of Carrie Tishhouse's deposition transcript in support of its contention that she was terminated by Martell on April 15, 2022. However, the Defendants have not submitted that page of her deposition transcript. Martell does not dispute that she was terminated by that date.

[4] Section 8.7 provides that the disputes arising out of the Agreement are governed by Indiana law. (ECF 50-6 at 9). No party disputes that Indiana law applies. The Court therefore applies Indiana law in its analysis.

"offer, acceptance, and consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction." *Jernas v. Gumz*, *53 N.E.3d 434, 445 (Ind. Ct. App. 2016)* (citations omitted). The intention of the parties to a written contract must be derived from their written expressions within the four corners of the contract. *Perfect v. McAndrew*, 798 N.E.2d 470, 479 (Ind. Ct. App. 2003). "Unambiguous contracts must be specifically enforced as written without any additions or deletions by the court." *Id.* Extrinsic evidence is only considered in determining the meaning of a contract when its language is ambiguous or uncertain. *Id.* "A contract is ambiguous if reasonably intelligent people could find its provisions susceptible to more than one interpretation." *Id.*; *see also N. Indiana Commuter Transp. Dist. v. Chicago SouthShore & S. Bend R.R.*, 744 N.E.2d 490, 496 (Ind. Ct. App. 2001) ("[A] contract is not ambiguous simply because a controversy exists where each party favors a different interpretation.").

The Defendants argue that under Section 5.5 of the Agreement, Martell agreed to employ the Tishhouses for at least two years. Section 5.5 of the Agreement states:

> 5.5    **Employment Agreements** - The parties contemplate entering into at-will Employment Agreements with Stephen Tishhouse and Carrie Tishhouse consistent with the terms of the Term Sheet between the parties, attached hereto as **Exhibit 3**, and as otherwise mutually agreeable to the parties.

(ECF 50-6 at 7) (emphasis in original).

Exhibit 3 as referenced under Section 5.5 is the Term Sheet. The Term Sheet states that both Stephen and Carrie Tishhouse would be offered positions at Martell for a minimum of two years. (ECF 50-6 at 19). Martell argues that the plain language of Section 5.5, particularly with the use of "contemplate," demonstrates an intent for the

parties to enter into an at-will employment agreement consistent with the terms of the Term Sheet sometime in the future, but not an intent to be bound at the time of executing the Agreement. And since it is undisputed that Martell and the Tishhouses did not execute a subsequent written employment contract following execution of the Agreement, Martell argues, there is no evidence of a contract in which Martell agreed to hire the Tishhouses for a minimum of two years.

The Defendants have a different interpretation of Section 5.5. They argue that Section 5.5 evinces an intent for the parties to be bound to an employment agreement that is "consistent with the terms" of the Term Sheet, including the two-year minimum employment term contained therein, but that the parties only give thought to—and thus are not forced or bound to agree to—entering into an "at will" employment agreement sometime in the future. (ECF 47 at 7- 8). The plain language of Section 5.5 does not support the Defendants' interpretation.

Section 5.5 is only one sentence. It provides that the parties "contemplate" entering into "at-will Employment Agreements" that are "consistent with the terms of the Term Sheet" and "as otherwise mutually agreeable to the Parties." (ECF 50-6 at 7). To borrow the Defendants' proffered definition of "contemplate," to "contemplate" means "to look at or view with continued attention; observe thoughtfully" (ECF 47 at 7 n.1 (citing Random House Webster's College Dictionary (2001)). Thus, the plain language of Section 5.5 evinces an intent that the parties are giving thought to an at-will employment agreement that has terms consistent with those set forth in the Term Sheet, and terms that are otherwise mutually agreeable to the parties. In other words, the

parties are agreeing to agree at some point in the future, and "a mere agreement to agree at some future time is not enforceable." *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996). Section 5.5 is not ambiguous because no reasonable person could come to a different conclusion about its meaning.

The Court recognizes that, in some cases, a preliminary agreement may be enforceable. Under Indiana law, "parties may make an enforceable contract which obligates them to execute a subsequent final written agreement." *Block v. Magura*, 949 N.E.2d at 1266 (citing *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996)). Such a contract contains all the essential terms of the agreement such that the final written agreement "is understood to be a mere memorial of the agreement already reached and may not contain a material term that is not already agreed upon." *Wolvos*, 668 N.E.2d at 674–75. However, Section 5.5 does not demonstrate an agreement on all essential terms such that a final written agreement would be "a mere memorial of the agreement already reached." *Id.*

Other provisions in the Agreement support the conclusion that the parties did not intend to be bound by the employment terms set forth in the Term Sheet when the parties entered into the Agreement. *U.S. Automatic Sprinkler Corp. v. Erie Ins. Exch.*, 204 N.E.3d 215, 223 (Ind. 2023) (when interpreting a contract, the Court must review the agreement in its entirety so as to harmonize provisions). Section 1.1-8, titled "Covenant Not to Compete," states that "[a]dditional provisions may be fully described in the Employment Agreements the Parties **contemplate entering into post closing**." (ECF 50-6 at 3) (emphasis added). As Martell also points out, other provisions in the Agreement

15

that incorporate other exhibits demonstrate an intent to be bound to the terms set forth in those exhibits at the time the parties entered into the Agreement. For instance, Section 1.1-1 of the Agreement provides that "Tishhouse **shall** convey all trade fixtures and equipment associated with the operation of Tishhouse, including but not limited to the assets set forth on Exhibit 1, attached hereto and **incorporated herein**," and Section 7.1 states that "[a]t the Closing, Tishhouse **shall** deliver to Martell…Bill of Sale conveying all of the Assets to Martell, a copy of which is attached hereto **and incorporated herein as Exhibit 4**." (ECF 50-6 at 8) (emphasis added). Neither provision, unlike Section 5.5, "contemplates" entering into an agreement "consistent" with the terms set forth in the corresponding exhibit. Nor does Section 5.5 provide that the parties "shall" enter into an employment agreements.

The Defendants argue that the Term Sheet on its own is enforceable. Even if the Term Sheet was an enforceable contract at the time it was executed on May 25, 2021, the Agreement—which was entered into June 18, 2021—also states:

> **8.1** **Entire Agreement** – This Agreement contains the entire agreement between Tishhouse and Martell with respect to the subject matter hereof. All representations, promises, and prior or contemporaneous understandings between the parties are merged into and expressed in this instrument, and any and all prior agreements between the parties, except as herein provided, are hereby cancelled.

(ECF 50-6 at 8).

Thus, under Section 8.1, any employment agreement provided for in the Term Sheet was cancelled when the parties entered into the Agreement.

The Defendants argue for the first time in its response to Martell's motion for summary judgment that Section 8.1 is unenforceable because the Tishhouses were "fraudulently induced" to enter into the Agreement. (ECF 56 at 6). "In Indiana, the elements of actual fraud and fraudulent inducement are the same: (1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; and (3) which caused the plaintiff to rely upon the misrepresentation to the plaintiff's detriment." *Ballard v. Allstate Ins. Co.*, No. 1:12-CV-01666-TWP, 2013 WL 6388400, at *1 (S.D. Ind. Dec. 6, 2013) (citations omitted).

Under Rule 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally" Fed. R. Civ. P. 9(b). Under Rule 8(c)(1), in responding to a pleading, a party must affirmatively state any affirmative defense, including fraud. Fed. R. Civ. P. 8(c)(1). The Defendants do not allege that Martell committed fraud in their counterclaim. (ECF 19). Nor do the Defendants state fraud as an affirmative defense in their answer to Martell's first amended complaint. (ECF 35). The Defendants are raising fraud for the first time in their response to Martell's motion for partial summary judgment . (ECF 56 at 8-10). The Seventh Circuit has "stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived." *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004).

The Defendants do not provide any explanation for the delay in raising a fraud defense. Further, "[o]nce the availability of an affirmative defense is reasonably

apparent, the defendant must alert the parties and the court to his intent to pursue that defense." *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997). The availability of a fraud defense should have been reasonably apparent to the Defendants when the dispute over the terms of any employment agreement first arose. The Defendants have not sought leave to amend their counterclaim to allege fraud, or their affirmative defenses to include a fraud defense. By not raising fraud until their response to Martell's motion for partial summary judgment, the Defendants have waived a fraudulent inducement defense. *Venters*, 123 F.3d at 968 ("A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.").

Finally, the Defendants argue that the Agreement is unenforceable because the Defendants' review of the Agreement was "minimal." (ECF 56 at 10). The Defendants do not contend that the signature on the Agreement is not theirs. A fundamental principle of contract law is that a person who signs a contract is presumed to know its terms and consents to be bound by them, and a failure to read the contract does not relieve a party of his obligations under the contract. *See Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992), *accord Palmer v. Menard, Inc.*, No. 3:12 CV 828, 2014 WL 835632, at *3 (N.D. Ind. Mar. 4, 2014).

Because the Defendants do not provide any evidence of the existence of a contract in which Martell agreed to employ the Tishhouses for a minimum of two years, they have failed to create a genuine dispute of material fact. Martell is therefore entitled to judgment as a matter of law as to Count I of the Defendants' counterclaim. The Court therefore denies as moot Martell's objections to the admissibility of a valuation letter

from broker Larry Baumgart of Tishhouse Electric's assets (ECF 48-10), and Paragraphs

2 and 7 of both Stephen Tishhouse's and Carrie Tishhouse's declarations in which both

state that they engaged a business broker to provide a valuation of Tishhouse Electric's

assets and that John Martell knew that the Tishhouses required a term of employment

(ECF 48-8 at 2-3; ECF 48-9 at 2-3) because the submitted evidence has no bearing on the

Court's determination.

### ii. The Defendants' breach of contract counterclaim as to profits for work-in-process (Count II)

As Count II of the Defendants' counterclaim, the Defendants allege that

Martell refused to remit payment to the Defendants for so-called work in process

proceeds to which Tishhouse Electric is entitled. (ECF 19 at ¶ 37). Under Sections

2.1 and 2.1-1 of the Agreement, it states:

> **2.1**. **<u>Work In Process</u>** – All work under contract by Tishhouse, including identification of the customer, contract amount, and status of the material, equipment, and labor, is set forth on **<u>Exhibit 2</u>**, attached hereto and incorporated herein ("Work in Process"). The Parties agree to compensate for the Work In Process as follows:
>
> **2.1-1**. For any Work in Process under contract as of the Closing Date that has not commenced as of the Closing Date, Martell shall perform the work pursuant to the terms of the contract with the Customer. Following completion of the work…Martell shall pay Tishhouse an amount equal to 50% of the net proceeds of the work.

(ECF 50-6 at 3-4) (emphasis in original).

Exhibit 2 of the Agreement includes "Pinehurst apartments Kalamazoo" under a

header titled "[n]ot formally approved in writing but priced out for Wolverine." (ECF

50-6 at 13). As part of the Tishhouses' representations and warranties under Article IV

of the Agreement, it also states under Section 4.8:

**4.8 Work In Process –** All Work In Process set forth on Exhibit 1 is subject to a written contract for the scope of work and in the amounts set forth on Exhibit 1.[5]

(ECF 50-6 at 4-5).

The Agreement also states that each of the representations and warranties by the Defendants "is true and correct on the date hereof, each of which shall be true on the Closing Date[.]" (ECF 50-6 at 4). The "Closing Date" is defined as on or before June 18, 2021, the date the Agreement was executed. (*Id.*).

Martell argues that, since the Pinehurst project was not under contract as of the closing date of the Agreement, the Tishhouses aren't entitled to proceeds from the Pinehurst project under Section 2.1. Martell thus moves for summary judgment as to Count II of the Defendants' counterclaim to the extent the Defendants are seeking proceeds from the Pinehurst project. (ECF 51 at 9).

The parties first dispute whether the Pinehurst project had to be under a written contract at the time the Agreement was executed for the Tishhouses to be entitled to its proceeds. If a written contract was required, then summary judgment is proper because it is undisputed that no written contract for the Pinehurst project with Wolverine was entered into until December 2021, months after the Agreement's closing date. (ECF 50-2 at 20-23).

---

[5] Section 4.8 contains a scrivener's error. It refers to Exhibit 1, which is titled "Trade Fixtures and Equipment" (ECF 50-6 at 10), rather than Exhibit 2, which is also referred in Sections 2.1 and 2.1-1 and is titled "Work In Process." (ECF 50-6 at 11). The parties' argument as to whether the Tishhouses are entitled to profits from the Pinehurst project focuses on the content of Exhibit 2 of the Agreement; therefore, the Court also analyzes the content of Exhibit 2 of the Agreement as part of its analysis.

Sections 2.1 and 2.1-1 do not specify that the contract for any Work-in-Process be written or oral. Martell argues that the Agreement required the contract to be written, pointing to the plain language of Section 4.8 that says all Works in Process are "subject to a written contract." The Defendants argue that Section 4.8 should be read in isolation from Sections 2.1 and 2.1-1, and that "Section 4.8 is intended to work in combination with the indemnification provision at Section 4.1." (ECF 56 at 13). The Defendants also argue that the choice to specify that the contract be "written" in Section 4.8 but not in Sections 2.1 and 2.1-1 demonstrates an intent for the Tishhouses to be entitled to proceeds for any Works in Process under an oral contract. The Court disagrees with the Defendants.

When interpreting a contract, the Court must review the contract as a whole. *Performance Servs., Inc. v. Randolph E. Sch. Corp.*, 211 N.E.3d 508, 512 (Ind. 2023). The Court "must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes them to be conflicting." *McCae Mgmt. Corp. v. Merchants Nat. Bank & Tr. Co. of Indianapolis*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990). Further "[w]ords of particular meaning will control general terms where both cannot stand together." *Id.*

Reasonably intelligent people could find that the parties agreed to certain profit sharing only for those Work in Process—including the Pinehurst project—that is under written contract as of the closing date. If the Tishhouses could be entitled to proceeds under Section 2.1-1 for oral contracts, then it would render the representation and warranty by the Tishhouses that any Works in Process are subject to a written contract

under Section 4.8 as of the closing date meaningless. *See Indianapolis-Marion Cnty. Pub. Libr. v. Shook, LLC*, 835 N.E.2d 533, 541 (Ind. Ct. App. 2005) ("Generally, the courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions.").

The Court must also give greater consideration to the more specified term under Section 4.8—"written contract"—than the general term of "contract" as provided under Section 2.1-1. *See also Fowler v. Campbell*, 612 N.E.2d 596, 600–01 (Ind. Ct. App. 1993) ("Where the parties have agreed to a specific term, an apparently inconsistent general statement must yield to the more specific term."). The Court finds that Section 4.8 imposes an additional requirement—that any contract for work in process be written as of the closing date—for the Defendants to be entitled to certain proceeds under Section 2.1-1.

For the sake of argument, even if Section 2.1-1 suggests an intent for an oral contract by the closing date to be permissible for the Tishhouses to be entitled to certain proceeds under that provision, Defendants have not shown the existence of an oral contract. For an oral contract to exist, there must be offer and acceptance. *Fox Dev., Inc. v. England*, 837 N.E.2d 161, 165 (Ind. Ct. App. 2005). The parties must also agree to all terms of the contract. *Id.* (citation omitted). A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract. *Id.*

The Defendants have failed to present any evidence of an agreement by Wolverine for the Pinehurst project or a meeting of the minds. It is undisputed that the Pinehurst project was initially set to start in October 2021, but did not start until

December 2021, when the contract was signed. (ECF 50-2 at 20). It is also undisputed the Pinehurst project was further delayed because it needed approval of funding from the State of Michigan. (ECF 50-2 at 23). Stephen Tishhouse also testified that it was his understanding that the written contract was not signed until December 2021 because Wolverine "won't pull the plug" until the State of Michigan approved the tax cuts. (ECF 50-2 at 22-23).

The Defendants present evidence that Wolverine invited Stephen Tishhouse to conduct walk throughs at the Pinehurst project and to ask clarifying questions as to the timing, materials, and scope of the project, that Tishhouse submitted a bid and was the only electrical contractor bidding, and that the Tishhouses gave a quote for electrical work on Pinehurst. (ECF 55-2). Even construing the evidence in the light most favorable to Defendants, the evidence demonstrates the existence of an offer by the Defendants, but not acceptance by Wolverine. Even if Wolverine's request for the Tishhouses to conduct a walk through and to ask questions can be considered a request for bids, "[i]t is hornbook law that an advertisement for bids is not an offer; it is at best a request for offers or a request for a reply that will further negotiation in the direction of an offer." *Rice v. Scott Cnty. Sch. Dist.*, 526 N.E.2d 1193, 1198 (Ind. Ct. App. 1988) ("[A] mere request for an offer is not an offer in Indiana.").

Because there is no evidence of an agreement or meeting of the minds, or evidence of an agreement of all terms of any purported oral contract between Defendants and Wolverine, including the price and scope of the agreement, the Defendants have failed to present evidence of the existence of a contract—either written

or oral—from which a jury could find in their favor on their breach of contract claim relating to the Pinehurst project. Accordingly, Martell is entitled to judgment as a matter of law.

Relatedly, the Defendants also contend that Martell admits it owes the Tishhouses $15,177.54 under the Work-in-Process provision for other work not attributed to the Pinehurst project, and move for judgment as a matter of law. (ECF 47 at 11-12). The Defendants designate testimony from Martell's Fed. R. Civ. P. 30(b)(6) deponent who testified that she agreed that Martell owes $15,177.54 under the Agreement's Work-in-Process provision. (ECF 48-13 at 14). Martell acknowledges that there are certain shared revenue payments that have not been paid to the Tishhouses, but there is a dispute over which party breached the Agreement first. (ECF 58 at 5-6). Under Indiana law, "[w]hen one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date." *Five Star Roofing Sys., Inc. v. Armored Guard Window & Door Grp., Inc.*, 191 N.E.3d 224, 237 (Ind. Ct. App. 2022) (citations omitted). Whether a breach is material is generally a question of fact to be decided by the trier of fact, and a material breach "is often described as one that goes to the heart of the contract." *Id.*

As this Court will detail more fully later in its Opinion, because there is a dispute as to whether any party is in breach of the Agreement and which party, if any, was the first to breach, the Court denies the Defendants' motion for summary judgment to the extent they move for judgment as a matter of law that the Defendants are entitled to

$15,177.54 in profits pursuant to the Work-in-Process provision of the Agreement for work not attributed to the Pinehurst project.

### iii.  Martell's breach of contract claims (Count I)

In Martell's first amended complaint, Martell alleges that the Defendants breached the Agreement in several respects. The Defendants move for summary judgment as to Martell's breach of contract claims.

> **1.  Stephen Tishhouse allegedly encouraging customers to cancel orders and Martell employees to work for a competitor.**

Martell alleges that Stephen Tishhouse breached the Agreement by encouraging two customers, John Stap and Jonathan Narwrocki, to cancel their orders with Martell, and by encouraging Martell employees Adam Beilby[6] and Ben Hansen[7] to leave their employment with Martell to work for a competitor, Hi-Tech Electric. (ECF 30 at ¶¶ 11, 13).

Defendants move for summary judgment, arguing that there is no relevant provision in the Agreement that the Defendants are in breach of. In Martell's response opposing Defendants' motion for summary judgment, Martell does not address the Defendants' contention, only arguing that the alleged conduct amounts to tortious

---

[6] Mr. Beilby's last name is spelled inconsistently throughout the parties' briefing and in the various evidence submitted. In Mr. Beilby's declaration, which the Defendants' present with its motion for summary judgment, it is spelled as "Beilby."(ECF 48-19). The Court therefore uses the spelling of "Beilby" as used in his declaration.

[7] Mr. Hansen's last name is also spelled inconsistently. In Benjamin Hansen's affidavit, which Martell presents as evidence in opposition of the Defendants' motion for summary judgment, his name is spelled "Hansen." *See* ECF 57-4. Accordingly, the Court uses the spelling of "Hansen" as provided in his affidavit.

interference with a contractual relationship. *See* ECF 58 at 13-15.  It is not the Court's

role to conduct research or develop arguments for Martell.  *Nelson v. Napolitano*, 657

F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir.

2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent

legal authority are waived.").

     Accordingly, the Defendants' motion for summary judgment regarding Martell's

breach of the Agreement claim as to the Defendants allegedly encouraging John Stap

and Jonathan Narwrocki to cancel their orders, and Adam Beilby and Ben Hansen to

leave their employment with Martell, is granted.

### 2. The Defendants' alleged failure to cease operations in breach of the Agreement.

     Martell alleges that the Tishhouses continued to operate Tishhouse Electric in

violation of the Agreement by:

(a) using the Tishhouse website to generate business;
(b) purchasing supplies in Tishhouse Electric's name from vendors;
(c) applying for permits under the Tishhouse name;
(d) sending invoices in Tishhouse Electric's name for work that was not listed on the Agreement's Work In Process schedule; and
(e) filing an annual report with the State of Michigan indicating that Tishhouse has continued to operate since Martell's acquisition in June 2021.

(ECF 30 at ¶¶ 10, 11).

     Again, to recover for a breach of contract a plaintiff must prove that: (1) a

contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered

damage as a result of the defendant's breach." *Collins v. McKinney*, 871 N.E.2d 363, 370

(Ind. Ct. App. 2007).

The Defendants move for summary judgment, and first argue that none of the alleged conduct implicates any provision of the Agreement. Martell argues that Defendants, "by virtue of the non-compete agreement, as well as the sale of all of its assets, were obligated to cease operations," and that the Tishhouses violated the Agreement by maintaining the website, purchasing supplies and applying for permits in Tishhouse Electric's name, sending invoices in Tishhouse Electric's name, and filing an annual report with the State of Michigan. Martell also makes a fleeting argument that the Defendants ordering supplies in its own name violated the Agreement's "requirement that all material be purchased by Martell." (ECF 58 at 11). As to placing orders with the suppliers in Tishhouse Electric's name, Martell argues that "to the extent such work was subject to the revenue sharing provisions of Section 2.1-2, such orders had the direct effect of depriving Martell of a 10% markup agreed to and contained in the Acquisition Agreement." (ECF 58 at 11). The Defendants counter that there is no explicit provision in the Agreement in which the Defendants agreed to "cease operations" or that required all material to be ordered by Martell.

The Defendants are correct that there is no explicit provision in the Agreement that requires the Defendants to "cease operations" or Martell to order supplies in its name. That said, the Agreement contains a noncompete provision. Under Section 1-1.8 of the Agreement, it states:

> 1.1-8    **Covenant Not To Compete** – Stephen Tishhouse and Carrie Tishhouse agree not to compete with the services provided by Martell and/or any affiliate designated by Martell for a period three years [sic] after closing within a 90-mile radius of the areas in which Tishhouse did business during the past 12 months. Additional provisions may be fully

described in the Employment Agreements the Parties contemplate entering into post closing.

(ECF 50-6 at 3).

The Defendants contend that there is no evidence that Defendants competed with Martell or that Martell was damaged. It is undisputed that there is no evidence of any leads generated through the Tishhouse website. (ECF 48-8 at 4). The Defendants designate deposition testimony from Martell's 30(b)(6) deponent in which she testified that she could not ascertain the damages associated with obtaining quotes under the Tishhouse name or related to the continued operation of the Tishhouse website. (ECF 48-13 at 16-18).

Martell, in opposition, asserts that they were damaged, and designate deposition testimony from its 30(b)(6) deponent who testified that Martell suffered a loss of revenue in excess of $1,300,000.000. (ECF 57-3). The 30(b)(6) deponent testified that the expected revenue for operating in the area for a senior service manager was "to bring in at least 2 million a year" but that Stephen Tishhouse did not meet those targets. (ECF 57-3 at 7). She then testifies that the construction revenue for 2022 was only "700 plus or minus thousand between Steve [Tishhouse] and Shane[8]" and a "service revenue of plus or minus 600,000." (ECF 57-3 at 8). When questioned whether "those numbers [were] impacted by the departure of the Tishhouses or their termination," Martell's 30(b)(6) deponent responded, "I think that **they did not help our reputation** in the Portage market by being part of that office." (ECF 57-3 at 8) (emphasis added). In other words,

---

[8] The Court cannot ascertain who "Shane" is referring to.

28

the designated testimony does not state that loss revenue was caused by the alleged violations of the noncompete agreement, or from the Defendants allegedly continuing to operate Tishhouse Electric.

The only other evidence of damages that Martell presents is invoices from Tishhouse Electric to Kendall Electric, submitted as Exhibits P and Q (ECF 57-5, 57-6), and invoices from Tishhouse Electric to Generac, submitted as Exhibit R (ECF 57-7). Martell argues that having the invoices in Tishhouse Electric's name deprived Martell its 10% markup provided under Section 2.1-1 of the Agreement.

While Martell's contention that the invoices in Tishhouse Electric's name deprived Martell of certain markups is conclusory—particularly because Section 2.1-1 requires certain conditions to be satisfied  for Martell to obtain 10% markup on its labor, equipment, and materials—the Defendants do not dispute that Tishhouse Electric invoicing Kendall Electric and Generac would have such an effect. Rather, the Defendants admit that the invoices for Kendall Electric submitted as Exhibit R show at most "a total cost of approximately $1,000" and that "[i]n their best day, Martell would be entitled to only 10% of that cost." (ECF 59 at 7). But the Defendants do object to the admissibility of the invoices filed as Exhibits P, Q, and R.  (ECF 60 at 13-14). Discovery closed April 1, 2024, but was extended to May 1, 2024 for the limited purpose of conducting the deposition of two Martell employees. The Defendants contend that Martell served the third-party subpoenas to Kendall Electric and Generac for the invoices one week before the close of discovery, and that the invoices were not obtained until after discovery closed. (ECF 60 at 13). In support of their objection, the Defendants

provided the Generac subpoena signed March 28, 2024, and ordering Generac to produce by April 12, 2024. (ECF 59-6). The Defendants also provided an undated Kendall Electric subpoena ordering production by April 8, 2024. (ECF 59-3). Defendants assert that the Kendall Electric subpoena was served on March 25, 2024. (ECF 59 at 6).

While Generac and Kendall Electric did not produce the documents until after discovery, in the interests of justice, the Court will nonetheless consider the invoices in ruling on the Defendants' motion because is undisputed that the subpoena to each third party was issued before the close of discovery on April 1, 2024—even if Martell was required under the Court's scheduling order to initiate all discovery at least forty-five days before the discovery deadline (ECF 28 at 4)—and the Defendants had an opportunity to respond to the evidence in its reply in support of its motion for summary judgment. Further, Defendants do not contend that Martell failed to promptly disclose the third-party productions upon receipt of the productions, or that Martell did not provide notice to the Defendants of the subpoenas. The cases Defendant cited in support of its objection are therefore distinguishable. *Chicago Joe's Tea Room, LLC v. Vill. of Broadview* concerned the repeated and consistent failure of a party to make a timely disclosure of its damages theories and evidence—not late productions from third parties. 94 F.4th 588 (7th Cir. 2024). *Black v. Youngue* also concerned a subpoena served *after* the close of discovery without notice to the other party. No. 14-505, 2014 WL 7335030, (W.D. Pa. Dec. 19, 2014) (emphasis added). Martell moves for leave to file a response to Defendants' motion to strike, which the Court treats as a motion for leave to file a sur-response because, under Local Rule 56-1(f), disputes about the admissibility of

evidence must be raised in the parties' summary judgment briefing—which is what Defendants did—not in separate motions to strike. Regardless, the Court will deny as moot Martell's motion for leave to file a sur-response as it has no bearing on the Court's determination regarding the admissibility of the invoices submitted as Exhibits P, Q, and R. The Court therefore considers those exhibits on ruling on the Defendants' motion for summary judgment.

Considering the Tishhouse Electric invoices to Kendall Electric, Martell has presented evidence of damages to create a genuine issue of material fact as to whether the Tishhouses violated the noncompete of the Agreement by Tishhouse Electric issuing invoices to Kendall Electric for projects that Martell was entitled to a 10% markup for under the Agreement.

As to the invoices to Generac, the Defendants counter that the Tishhouses invoiced Generac at Martell's direction because the Generac products were subject to extended warranties, and that if the account was changed over to Martell, Martell would need to ensure the warranties still applied. (ECF 59 at 7). Defendants present an email dated September 28, 2021, three months after the parties entered the Agreement, in which Tom Rowell of Martell said to Stephen Tishhouse "we should have you renew under Tishhouse and then we will reach out to Generac and transfer everything over. We can use our credit card to pay for these items. I am concerned if we try and pay for this under the Martell account this could easily get goofed up by Generac…I would rather play on the safe side." (ECF 59-10 at 1).

There are several Tishhouse Electric invoices to Generac dated after the Agreement was signed on June 18, 2021, but before the September 28, 2021 email from Martell, including June 23, 2021 (ECF 57-7 at 10), August 3, 2021 (*Id*. at 8), and August 10, 2021 (*Id*. at 4). There are also invoices after September 28, 2021, including October 25, 2021 (*Id*. at 17), April 5, 2022 (*Id*. at 23), and June 23, 2022 (*Id*. at 25). There is no evidence that Tishhouse Electric had Martell's permission to send the invoices before that September 28, 2021 email, or how long Tishhouse Electric had such permission, particularly because the email from Tom Rowell indicated an intent to transfer the warranties to Martell. Construing all facts in the light most favorable to Martell as the nonmoving party, and drawing all reasonable inferences in its favor, there is a genuine issue of material fact as to whether the Defendants competed with Martell's services by issuing invoices to Generac without Martell's permission.

Martell, however, has failed to present any evidence of damages stemming from the Tishhouses using the Tishhouse website to generate business, applying for permits or obtaining quotes under Tishhouse Electric's name, or from filing an annual report with the State of Michigan indicating that Tishhouse Electric has continued to operate since Martell's acquisition in June 2021. The Defendants are therefore entitled to judgment as a matter of law as to Martell's breach of contract claim stemming from that alleged conduct.

### 3.    The Tishhouses alleged misapplication of shop time.

Martell alleges that the Tishhouses breached the Agreement by misapplying what they refer to "job time" as "shop time" rather than billing to specific jobs, which

allegedly artificially inflated the Tishhouses' profit margins for jobs in which the Tishhouses received payments from Martell as part of the Agreement. The Defendants move for summary judgment, and argue that there is no provision in the Agreement related to the misapplication of "job time" to "shop time." Martell, in a conclusory manner, argues that it is a breach of the Agreement, but fails to cite the specific provision of the Agreement that is allegedly breached.  In reviewing the Agreement, the Court agrees with the Defendants.

The Court can only ascertain one provision under the Agreement that relates to the Tishhouses being entitled to profit sharing. Section 2.1, as the Court has already discussed, is the Work in Process provision. It provides that Martell "shall perform the work pursuant to the terms of the contract with the Customer." (ECF 50-6 at 3). Following completion of the work and determination of the costs, Martell agreed to invoice the Customer and, upon payment by the Customer, pay Tishhouse up to 50% of the net proceeds. (ECF 50-6 at 3-4). Martell's position appears to be—which again, the Court can only opine as Martell fails to develop any argument as to this issue—that the Defendants artificially inflated the proceeds, and therefore recouped higher payments than they should have been entitled to under Section 2.1. But purported errors in billing by the Tishhouses does not give rise to a breach of Section 2.1 because it is unrelated to the obligations set forth in that provision. For instance, a breach of Section 2.1 could arise if Martell failed to perform the Work in Process jobs or invoice the customer, or pay the Defendants less than 50% net proceeds. But that's not what Martell alleges.

Perhaps the Defendants' alleged conduct gives rise to a breach of another contract, or is sound in tort. But Martell does not allege or argue that the conduct is anything but a general breach of the Agreement. It's not the Court's role to construct the legal arguments available to Martell. *See Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995). Martell has failed to establish the existence of a genuine issue of material fact as to whether the Tishhouses breached the Agreement by their alleged misapplication of "job time" as "shop time" to receive larger profits, therefore the Defendants are entitled to judgment as a matter of law.

### iv.  Tortious interference with contractual relationships

The elements of a tortious interference with a contractual relationship claim are: "(1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages." *Coleman v. Vukovich*, 825 N.E.2d 397, 403 (Ind. Ct. App. 2005). For a defendant to have acted without justification, the defendant's actions must "be malicious and exclusively directed to the injury and damage of another." *Id.* A claim for tortious interference with a contractual relationship may arise when the underlying contract is based upon a contract terminable at will. *Bradley v. Hall*, 720 N.E.2d 747, 751 (Ind. Ct. App. 1999); *Wells v. Freeman Co.*, No. 3:21-CV-47-JRS-MPB, 2022 WL 17736638, at *14 (S.D. Ind. Dec. 16, 2022) ("Indiana courts treat a claim for tortious interference with a business relationship as a claim for tortious interference with a *contractual* relationship when the underlying employment relationship is one based upon a contract terminable at will.") (emphasis added). Defendants move for

34

summary judgment on Martell's tortious interference with a contractual relationship claim as to Martell customers John Stap and Jonathan Nawrocki, and as to Martell employees Adam Beilby and Ben Hansen. The Court will address each in turn.

### 1. John Stap

Martell alleges that the Tishhouses encouraged Martell customer John Stap to cancel his order with Martell for a generator installation totaling $11,571.70 and advised Mr. Stap to complete the work with a Martell competitor. (ECF 30 at ¶ 11).

While Martell alleges that the customer is "John Stap," the customer appears to be Hawks Hollow Builders, and that John Stap is an employee of Hawks Hollow Builders. The parties do not dispute that Martell had a contract with Hawks Hollow Builders. Martell presents an invoice with Hawks Hollow Builders that has "STAP" as the "Scope of Work." (ECF 48-15) (emphasis in original). It is also undisputed that Hawks Hollow Builders cancelled the order. (ECF 48-17 at 9).

Stephen Tishhouse denies encouraging Mr. Stap to cancel his order with Martell. (ECF 48-8). Martell's 30(b)(6) witness testified that someone called the Portage office and spoke to either "Shane" or "Chris"—both Martell employees—and said that Stephen Tishhouse contacted them and told him to cancel the work with Martell. (ECF 48-13 at 22). Shane Allen of Martell testified that he never received a phone call from John Stap or anyone associated with John Stap, and has no personal knowledge regarding the allegation that Stephen Tishhouse encouraged John Stap to cancel his order with Martell. (ECF 48-16 at 7). Chris Wilson, on the other hand, testified that he either spoke with John Stap or a representative from Hawks Hollow, and that the

individual informed Wilson that they were going to cancel the work and have someone else finish it. (ECF 48-17 at 10). When asked whether that individual told Wilson that Stephen Tishhouse encouraged them to cancel the order, Wilson testified "No, probably—I don't know. Honestly, I don't know. I don't believe that they probably came out and said Steve said to cancel this. I don't know that they did that." (*Id.*). Wilson nevertheless found the cancellation "suspicious." (*Id*. at 9).

Martell presents an affidavit by Martell employee Benjamin Hansen. (ECF 57-4). As a preliminary manner, the Defendants, citing Indiana caselaw, move to exclude Mr. Hansen's affidavit, arguing that Martell may not create a genuine issue of material fact by submitting an affidavit that directly contradicts the prior sworn deposition testimony of Martell's 30(b)(6) witness. (ECF 60 at 8). The Court is to exclude affidavits that conflict with the affiant's **own** sworn deposition testimony. *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985) (" Parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict **their own** depositions.") (emphasis added). Defendants have not shown that Mr. Hansen's affidavit conflicts with Mr. Hansen's own deposition testimony; therefore, the Court overrules the Defendants' objection.

The Court also notes that, in the Defendants' response opposing Martell's motion for leave to file a response to the Defendants' motion to strike, Defendants assert for the first time that Ben Hansen's affidavit was not produced during discovery. (ECF 64). While the Defendants referred to Mr. Hansen's declaration as being submitted at the "eleventh-hour" in its reply in support of its motion for summary judgment, the

Defendants did not object to its admission in its reply based on it being produced after discovery closed. (ECF 60 at 7). The Defendants' response opposing Martell's motion for leave—filed almost three weeks after the Defendants' reply in support of its motion for summary judgment—should have only addressed the Defendants' position as to whether the Court should grant Martell leave, not use it as an opportunity to raise additional objections that the Defendants failed to raise in its summary judgment briefing. Further, under Local Rule 56-1(f), any disputes about the admissibility of evidence must be raised in the parties' summary judgment briefs. The Defendants have therefore waived their objection to Ben Hansen's affidavit for being produced after the close of discovery.

In Mr. Hansen's affidavit, he states that on or around the time Stephen Tishhouse's employment was terminated, Stephen Tishhouse told Mr. Hansen that he "intended to call the Martell customers he worked with, with the intention of convincing such customers to leave Martell." (ECF 57-4 at 3). Considering Mr. Hansen's affidavit, Martell has demonstrated that there is a genuine issue of material fact as to whether Stephen Tishhouse tortiously interfered with Martell's contractual relationship with Mr. John Stap and Hawks Hollow.

Finally, Martell objects to the admissibility of a declaration proffered by the Defendants from Sera Gesmundo, the President of Hawks Hollow Inc., in which she states that Hawks Hollow stopped doing business with Martell for reasons unrelated to Steve Tishhouse. (ECF 48-18). Even considering the Gesmundo affidavit, it has no bearing on the Court's conclusion that Martell has presented evidence to show that

there is a genuine issue of material fact as to whether Stephen Tishhouse encouraged Hawks Hollow to cancel its order with Martell for the Stap project. Thus, the Court denies as moot Martell's objection to the Gesmundo declaration.

## 2.  Jonathan Nawrocki

Martell also alleges that the Tishhouses encouraged customer Jonathan Nawrocki to cancel his order with Martell for a generator installation totaling $2,800.70, and advised Mr. Nawrocki to complete his work with a competitor of Martell. (ECF 30 at ¶ 11). The Defendants argue that summary judgment is proper because there is no evidence that Stephen Tishhouse encouraged Mr. Nawrocki to cancel his order.

It is undisputed that Mr. Nawrocki also cancelled an order with Martell. (ECF 48-13 at 24). Stephen Tishhouse denies encouraging Mr. Nawrocki to cancel his order with Martell. (ECF 48-8). Martell's 30(b)(6) deponent testified that a customer representative told "whoever answered the phone" that Mr. Nawrocki "wanted to cancel because Steve [Tishhouse] contacted them. (ECF 48-13 at 24). Chris Wilson testified that Mr. Nawrocki called Martell and told Wilson that he was cancelling the work with Martell, but Mr. Nawrocki did not say to Wilson that Stephen Tishhouse encouraged him to cancel. (ECF 48-17 at 11-12). But Wilson testified that he had suspicions that Stephen Tishhouse was also behind the Nawrocki cancellation. (ECF 48-17 at 12). In opposition to the Defendants' motion, Martell also presents Mr. Hansen's affidavit stating that Stephen Tishhouse told him that he intended to call the Martell customers he worked with to convince such customers to leave Martell. (ECF 57-4 at 3). Defendants object to admission of Mr. Hansen's affidavit as being inconsistent with prior deposition

38

testimony. However, as the Court already noted, the Defendants have not shown that

Mr. Hansen's affidavit is inconsistent with Mr. Hansen's own deposition testimony.

Accordingly, the Court, in considering Mr. Hansen affidavit, finds that Martell has

established that there is a genuine issue of material fact as to whether Stephen

Tishhouse encouraged Martell's customer Jonathan Nawrocki to cancel his order with

Martell.

### 3. Adam Beilby

As to Martell employee Adam Beilby, Martell alleges that Stephen Tishhouse

contacted Mr. Beilby and encouraged him to leave Martell to work for a competitor Hi-

Tech Electric. (ECF 30 at ¶¶ 13-14). The Defendants move for summary judgment,

arguing that there is no evidence that Stephen Tishhouse encouraged Mr. Beibly to

leave his employment with Martell.

As a preliminary manner, the Defendants move to exclude Paragraph 7 of Mr.

Hansen's affidavit that Martell has presented in opposition to Defendants' motion for

summary judgment, arguing that Paragraph 7 contains hearsay. An affidavit or

declaration used to oppose a motion must be made on personal knowledge, and set out

facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). Inadmissible hearsay

contained in affidavits may not be considered. *See Wigod v. Chicago Mercantile Exch.*, 981

F.2d 1510, 1519 (7th Cir. 1992). Paragraph 7 of Mr. Hansen's affidavit states:

> At this time, Adam Bielby ("Bielby") told me that Stephen Tishhouse
> indicated to Bielby that he was likely to be fired by Martell. Bielby
> explained to me that this was why he decided to leave Martell and take a
> job with one of Martell's competitors.

(ECF 57-4 at 3).

Since Stephen Tishhouse is a party opponent, his purported statement to Mr. Beilby is non-hearsay under Rule 801(d)(2)(A). But Mr. Hansen, who did not participate in this conversation between Stephen Tishhouse and Mr. Beibly, lacks the requisite personal knowledge of the purported statement from Stephen Tishhouse to Mr. Beilby for it to be admissible under Fed. R. Civ. P. 56(c)(4). Further, Mr. Beilby's purported statement to Mr. Hansen in which Mr. Beilby explained that Stephen Tishhouse's statement was "why [Beilby] decided to leave Martell and take a job with one of Martell's competitors" is hearsay. Mr. Beilby is the out-of-court declarant, and the Defendants are offering the statement to prove the truth of the matter asserted—that Mr. Beilby left Martell because of Stephen Tishhouse's purported encouragement. Accordingly. the statement from Mr. Beilby to Mr. Hansen is hearsay and inadmissible under Fed. R. Evid. 801(c) and 802. The Court therefore sustains the Defendants' objection to Paragraph 7 of Mr. Hansen's affidavit, and does not consider that paragraph in ruling on the motion.

With the exclusion of Paragraph 7 of Mr. Hansen's affidavit, the only proffered evidence that Stephen Tishhouse encouraged Mr. Beilby to leave his employment with Martell is Martell's 30(b)(6) deponent testifying that Mr. Beilby told either Chris Wilson or Ben Hansen[9] that Stephen Tishhouse "encouraged [Mr. Beilby] to go to High Tech." (ECF 48-13 at 25). It is undisputed that Mr. Beilby is a former Martell employee that left

---

[9] The Defendants assert that Martell's 30(b)(6) witness testified that Mr. Beilby had this conversation with Chris Wilson. (ECF 57 at 19). While the 30(b)(6) witness initially testified that it was "Chris" who had this conversation with Mr. Beilby, she later testified that Mr. Beilby had this conversation with either "Ben or Chris" and that she was told about the conversation "after the fact by Chris." (ECF 48-13 at 25).

Martell after Martell terminated the Tishhouses. (ECF 48-13 at 24). However, Mr. Beilby testified that Stephen Tishhouse did not encourage him to leave Martell, and that his decision to leave Martell had nothing to do with Stephen Tishhouse. (ECF 48-19). Stephen Tishhouse also denies encouraging Mr. Beilby to leave Martell. (ECF 48-8). No reasonable jury could return a verdict on this issue for Martell based solely on Martell's 30(b)(6) deponent's testimony of a conversation she has no personal knowledge of, and that directly conflicts with Mr. Beilby's and Stephen Tishhouse's testimony. *See Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 571 (7th Cir. 2022) ("An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment."). Accordingly, the Defendants are entitled to judgment as a matter of law.

### 4.  Ben Hansen

The Defendants also move for summary judgment as to Martell's tortious interference with a contractual relationship claim as to Martell employee Ben Hansen. Martell alleges that Stephen Tishhouse encouraged Mr. Hansen to leave employment with Martell to work for competitor Hi-Tech Electric. (ECF 30 at ¶ 13). It is undisputed that Mr. Hansen is a service technician who currently works for Martell. (ECF 48-13 at 26). The Defendants, as it did with the other tortious interference claims, present Martell's 30(b)(6) deponent's testimony that Mr. Hansen told Chris Wilson that Stephen Tishhouse encouraged Mr. Hansen to leave employment, and that Chris Wilson then relayed that conversation to Martell's (30)(b)(6) deponent. (ECF 48-13 at 26). Mr. Wilson denies having this conversation with Mr. Hansen. (ECF 48-17 at 13). Stephen Tishhouse

also denies encouraging Mr. Hansen to leave Martell. (ECF 48-8 at 4). However, Martell has demonstrated a genuine issue of material fact as to whether Stephen Tishhouse encouraged Mr. Hansen to leave Martell by presenting an affidavit by Mr. Hansen that says Stephen Tishhouse "encouraged [Hansen] to leave Martell's employment. [Hansen] was renting [his] home from the Tishhouses' at the time. When [Hansen] stated that [he] was not leaving Martell, Stephen retaliated and increased [Hansen's] monthly rent[.]" (ECF 57-4 at 3).

The Defendants argue for the first time in their reply that summary judgment is proper because Mr. Hansen continues to be employed by Martell, therefore Martell has no damages. (ECF 60 at 9). Defendants have waived this argument by raising it for the first time in their reply brief. *See United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007).

### v. Martell's conversion claim (Count IV)

Martell alleges that the Defendants accepted payments for Work Orders 43902 of $819.00 and $80.00 from Lee Township Fire Department for work performed by Martell, which was deposited into a Tishhouse bank account. (ECF 30 at ¶ 11). Defendants argue that summary judgment is proper as to Martell's conversion claim.

Under Ind. Code § 35-24-3-1, a person who proves the elements of criminal conversion by a preponderance of the evidence can recover the costs of the action, reasonable attorney's fees, and treble damages. *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1166–67 (Ind. Ct. App. 2008). Criminal conversion requires proof that a person knowingly or intentionally exerted unauthorized control over property of another. Ind. Code § 35–43–4–3. Money gives rise to a conversion claim if it's "capable

of being identified as a special chattel." *Bowden v. Agnew*, 2 N.E. 3d 743, 750 (Ind. Ct. App. 2014). This means the money must be "a determinate sum with which the defendant was entrusted to apply to a certain purpose." *Id*.   However, it is "well established that refusal to pay a debt will not generally support a conversion claim." *Id*. at 750-51.

Defendants assert that summary judgment is proper because it is undisputed that the Tishhouses already remitted the payments from Lee Township Fire Department to Martell. (ECF 48-13 at 21). Martell did not respond to the Defendants' contention. Therefore, any such argument is waived. *See Beavers*, 756 F.3d at 1059.

Martell instead argues in a conclusory and undeveloped manner that dismissal of its conversion claim is improper because the Tishhouses' alleged act of placing "hundreds of orders in the name of their former company, and not Martell, constitutes a wrongful exercise of control over a right of Martell's that deprived Martell of its markup, inflated the Tishhouses' share of project revenue, and inconsistent with their role as Martell employees" gives rise to a conversion claim. (ECF 58 at 12). Martell fails to cite to any authority in support of its argument. Defendants counter that Martell's asserted right to markup proceeds and share of project revenue constitutes a failure of the Defendants to pay a debt, and therefore fails to support a conversion claim.

The Indiana Court of Appeals decision in *Bowden v. Agnew* is instructive. 2 N.E. 3d 743 (Ind. Ct. App. 2014). There, the parties agreed to split 50/50 certain net profits from a business deal, and the plaintiff sued the defendant for conversion for failure to provide its portion of net revenues due under their agreement. *Id*. at 745. The Indiana

43

Court of Appeals held that the defendant's wrongful failure to distribute net revenue in accordance with the 50/50 agreement constitutes a failure to pay a debt, not criminal conversion, because the money withheld was not a separate, specifically identifiable chattel that were entrusted to the defendant. *Id. at 750.*  Martell does not contend that it entrusted the order payments or markup proceeds to the Tishhouses for any particular purpose.

Accordingly, because the only specifically identifiable chattel underlying Martell's conversion claim—the payments from Lee Township Fire Department—is no longer in the Defendants' control and was remitted to Martell, and Martell has not identified any other separate, specifically identifiable chattel that was entrusted to the Defendants, the Defendants are entitled to judgment as a matter of law, and Martell's conversion claim is dismissed.

### III.    CONCLUSION

For the reasons discussed above, Defendants' motion for judgment on the pleadings is **GRANTED IN PART** and **DENIED IN PART**. (ECF 46). Martell's tortious interference with business relationships claim (Count III) is **DISMISSED** for failure to state a claim, and Defendants' motion for summary judgment as to the tortious interference with business relationships claim is therefore **DENIED AS MOOT**.

The Court further **DENIES AS MOOT** Martell's motion for leave to file response to Defendants' motion to strike (ECF 63). The Court also **DENIES AS MOOT** Martell's objections to the admissibility of a valuation letter of Tishhouse Electric's assets from Larry Baumgart (ECF 48-10), Paragraphs 2 and 7 of both Stephen Tishhouse's and

Carrie Tishhouse's declarations (ECF 48-8 at 2-3; ECF 48-9 at 2-3), and the Sera Gesmundo declaration. (ECF 48-18). The Court **SUSTAINS** the Defendants' objection to Paragraph 7 of Mr. Ben Hansen's affidavit, and **OVERRULES** Defendants' remaining objections to Mr. Hansen's affidavit (ECF 57-4).

The parties' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**. (ECF 46, 49).

Martell is entitled to judgment as a matter of law on the following claims, which are therefore **DISMISSED**:

- The Defendants' Count I (breach of employment agreements). (ECF 19 at 8).

- The Defendants' Count II (breach of work in process contract) as to the Wolverine - Pinehurst project. (ECF 19 at 8-9).

The Defendants are entitled to judgment as a matter of law on the following claims, which are therefore **DISMISSED**:

- Martell's Count I (breach of contract) as to encouraging customers to cancel orders and Martell employees to work for a competitor, using the Tishhouse website to generate business, applying for permits and obtaining quotes under the Tishhouse name, filing reports with the State of Michigan, and misapplying certain billing time. (ECF 30 at 4).

- Martell's Count III (tortious interference with contractual relationships) as to Martell employee Adam Beilby. (ECF 30 at 4-5).

- Martell's Count IV (conversion). (ECF 30 at 5).

Accordingly, the only claims to proceed are:

- Martell's Count I (breach of contract) as to Defendants issuing invoices to Generac and Kendall Electric in Tishhouse Electric's name. (ECF 30 at 4).

- Martell's Count III (tortious interference with contractual relationships) as to customers John Stap / Hawks Hollow and Jonathan Nawrocki, and as to Martell employee Ben Hansen. (ECF 30 at 4-5).

- The Defendants' Count II (breach of work in process contract) as to any non-Pinehurst work. (ECF 19 at 8-9).

- The Defendants' Count III (statutory conversion). (ECF 19 at 9-10).

SO ORDERED.

February 4, 2025

    /s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT